IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------------

In the Matter of the Arbitration Proceedings between

JOHN HANCOCK LIFE INSURANCE COMPANY,      Civil Action No.
Petitioner,                                04 10181 MLW

        and

SPHERE DRAKE INSURANCE LIMITED,
      Respondent.

-------------------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The petitioner, John Hancock Life Insurance Company ("John Hancock") filed a Verified Amended Petition to Compel Arbitration Proceedings together with Motions for a Temporary Restraining Order and Preliminary Injunction seeking to enjoin Sphere Drake Insurance Limited ("Sphere Drake") from initiating or moving forward with any proceedings in England, or elsewhere whether by way of arbitration or litigation, with respect to the seven reinsurance contracts. The relevant contracts are between John Hancock and Sphere Drake which are the subject of the original Petition to Compel Arbitration Proceedings ("Petition") and the Verified Amended Petition ("Amended Petition") now before this Court.

## I.    FACTUAL STATEMENT

### A.    Seven Reinsurance Agreements at Issue

As set forth in the Amended Petition, between 1997 and 1998 John Hancock (f/k/a John Hancock Mutual Life Insurance Company") and Sphere Drake Insurance Limited (f/k/a Sphere Drake Insurance Plc and Odyssey Re (London) Ltd., entered into a

number of reinsurance agreements pursuant to which Sphere Drake agreed to indemnify John Hancock ("John Hancock/Sphere Drake Ceded Contracts" or "Contracts") with regard to two types of underlying reinsurance business commonly referred to as workers' compensation carve-out business ("Carve-Out") and London Market Excess ("LMX") and similar London Market business. (See Amended Petition, ¶ 2 and the Amended Affidavit of Mitchell S. King filed with the Amended Petition ("Amended King Aff."), ¶ 2.) These contracts include the following seven reinsurance agreements (the "Seven Agreements") at issue before the Court:

> (a) Specific Realm – AH0094197;
> (b) Specific Realm - AH0094297;
> (c) Specific Realm - AH0094397;
> (d) Specific Realm - AH0104997;
> (e) Specific Realm – AH0105097
> (collectively the "Realm Agreements");
> (f) BE LMX Quota Share – TNC0906/98 ("Quota Share Agreement); and
> (g) 95% Quota Share Retrocession – TNC0887/98 ("95% Facility Quota Share Agreement").

(See Amended Petition, ¶ 9, and the Affidavit of Joseph Welch ("Welch Aff."), ¶ 6 and Petitioner's Exhibits ("Pet.Ex."), 1-7 filed with the Amended Petition.)

**B.    Disputes Between John Hancock and Sphere Drake Under the Seven Agreements and the Parties Simultaneous Arbitration Demands.**

Disputes have arisen with respect to amounts Sphere Drake owes John Hancock under the Seven Agreements. Collectively, over $9,900,000.00 in balances are due and owing to John Hancock under these agreements. (See Amended Petition, ¶ 32, and Welch Aff., ¶ 7.) Sphere Drake has recently asserted that it is entitled to rescind the Seven Agreements. (See Amended Petition, ¶ 34, and Amended King Aff., ¶ 6 and Pet. Ex. 12.) The parties do not dispute that each of the Seven Agreements contains an

arbitration clause governing disputes thereunder.  (See Amended King Aff., ¶ 3 and Pet. Ex. 11.)

On January 23, 2004, John Hancock demanded individual U.S. arbitration proceedings with respect to twenty (20) separate John Hancock/Sphere Drake Ceded Contracts, subject to Massachusetts law and procedure, including the Seven Agreements. (See Amended Petition, ¶ 29, and Amended King Aff., ¶ 8 and Pet. Ex. 14.)  Contrary to the intent of the parties, as evidenced by the contractual documentation, as well as the parties' course of dealing, Sphere Drake has refused to submit to U.S. arbitration proceedings as demanded by John Hancock with respect to the Seven Agreements. Instead, Sphere Drake simultaneously demanded that arbitration proceedings take place in the United Kingdom, subject to U. K. law and procedure, specifically the English 1996 Arbitration Act ("English Act").[1]  (See Amended Petition, ¶ 36, and Amended King Aff., ¶ 9 and Pet. Ex. 16.)  With respect to the other thirteen (13) Contracts that were the subject of John Hancock's demands, Sphere Drake did not refuse to arbitrate as demanded, but rather, advised "we note the position you have taken and you will receive a further response under separate cover in due course."  (See Amended King Aff., ¶ 9.)

**C.    John Hancock's Petition to Compel U.S. Arbitration Proceedings.**

Because of Sphere Drake's refusal to submit to arbitration proceedings and its insistence that the arbitration proceedings with respect to the Seven Agreements occur in the United Kingdom ("U.K.") subject to U.K. law and procedure, John Hancock filed its Petition with this Court on January 26, 2004. (See Amended Petition, ¶¶ 38 and 39, and

---

[1] By agreement of the parties, John Hancock's demand for arbitrations was deemed served on January 26, 2004.  Also by agreement of the parties, Sphere Drake's January 23, 2004 letter containing arbitration demands, which included the Seven Agreements, was deemed served on January 26, 2004, simultaneous to John Hancock's demands.  (See Amended King Aff.,¶¶ 8 and 9.)

Amended King Aff., ¶ 10.) That day, John Hancock sent courtesy copies of the Petition and supporting papers to Sphere Drake. (See Amended Petition, ¶ 39, and Amended King Aff., ¶ 10 and Pet. Ex. 15.)

On January 28, 2004, John Hancock served a Summons with a five (5) day return pursuant to Section 4 of the FAA (9 U.S.C. §4),with the Petition and accompanying papers upon Sphere Drake through: (a) the Massachusetts Commissioner of Insurance, as the lawful attorney upon whom service may be made on behalf of Sphere Drake pursuant to M.G.L. c. 175 B, §2; and (b) the law firm of Mendes & Mount in New York, as the designated service of process agent in the Service of Suit clauses referenced in the Slips for the Seven Agreements. (See Amended Petition, ¶ 40, and Affidavit of Service filed herewith, ¶¶ 8 and 9 and Amended King Aff., ¶ 11.) John Hancock also sent courtesy copies of the Summons and Petition papers to the U.S. law firm previously identified by Sphere Drake as its U.S. counsel, Butler Rubin Saltarelli & Boyd, as well as the U.K. solicitors firm of Clyde & Co, Sphere Drake's U.K. counsel. (See Amended Petition, ¶ 40, and Affidavit of Service, ¶¶ 11 and 12 and Amended King Aff., ¶ 11.)

On January 28, 2004, Sphere Drake acknowledged receipt of a copy of the summons, Petition and accompanying papers and requested an extension of time beyond the five days in which to respond to the Petition. (See Amended Petition, ¶ 41, and Amended King Aff., ¶ 12.) John Hancock offered Sphere Drake an extension of time, subject to conditions which would not prejudice John Hancock's ability to expeditiously litigate its rights before this Court without the immediate threat of a competing U.K. litigation or the running of any time periods under the English Act for, inter alia, the designation of an arbitrator in connection with Sphere Drake's demand for U.K.

4

arbitration. (See Amended Petition, ¶ 42, and Amended King Aff. ¶ 13 and Pet. Ex. 17.) Sphere Drake advised it would not accept an extension subject to any conditions on other actions it might take. (See Amended Petition, ¶ 43, and Amended King Aff., ¶ 14.)

On January 30, 2004, John Hancock acknowledged Sphere Drake's position and asked its U.S. counsel to clarify Sphere Drake's position on service pursuant to the Service of Suit provisions in the Slips for the Seven Agreements. (See Amended Petition, ¶ 44, and Amended King Aff., ¶ 15 and Pet. Ex. 18.) Sphere Drake has, thus far, failed to respond. (See Amended Petition, ¶ 44, and Amended King Aff., ¶ 15.)

By virtue of Sphere Drake's rejection of the condition designed to protect John Hancock's rights to have the Petition heard by this Court, John Hancock believes Sphere Drake has already filed or will file in the immediate future, a competing action before the English Court to compel John Hancock to proceed with U.K. arbitrations concerning the Seven Agreements. (See Amended Petition, ¶ 45, and Amended King Aff., ¶ 16.) The deadline for John Hancock's response to the U.K. arbitration demand is also approaching.

As will be addressed below, because of Sphere Drake's attempts through arbitration proceedings and anticipated U.K. litigation, to undermine the Court's jurisdiction and the irreparable harm that John Hancock stands to suffer as a result, an antisuit injunction is warranted

## II.    ARGUMENT

### A.    An Antisuit Injunction In This Matter is Essential to Preserve the Status Quo and Prevent Irreparable Loss of Rights to John Hancock.

It is well settled that the courts have power to enjoin a party from pursuing litigation before a foreign tribunal. See In Re Lernout & Hauspie Securities Litigation v. Dammekens, 2003 U.S. Dist. Lexis 22466, *18 (D. Mass. December 12, 2003), citing

United States v. Davis, 767 F.2d 1025, 1038 (2d Cir. 1985). Such "antisuit" injunctions are issued in order to "preserve[e] the status quo and prevent[] the irreparable loss of rights before judgment. Textile Unlimited, Inc. v. A. BMHand Co., Inc., 240 F.3d 781, (9th Cir. 2001) quoting Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984).

A district court entertaining an application for injunctive relief "in aid of arbitration is consistent with the court's powers pursuant to § 206" of the Convention on the Recognition of Foreign Arbitral Awards, 9 U.S.C. § 201 et. seq. Borden, Inc. v. Meji Milk Products Co., Ltd., 919 F.2d 822, 826 (2d Cir. 1990) (citations omitted).

When determining whether it is appropriate to issue an antisuit injunction, a court is "required to balance domestic judicial interests against concerns of international comity" and must "weigh the need to prevent vexatious or oppressive litigation and to protect the court's jurisdiction against the need to defer to principles of international comity." Karaha Bodas Co. v. Negara, 335 F.3d 357, 366 (5th Cir. 2003). See also Northwest Airlines, Inc. v. R&S Co. S.A., 176 F.Supp.2d 935 (D. Minn. 2001); In Re Lernout, 2003 U.S. Dist. Lexis 22466 (D. Mass. December 12, 2003) (finding an antisuit injunction was "necessary to protect [the] Court's jurisdiction over discovery, and to vindicate the important public policy of protecting investors from security fraud."). Notions of comity, however, do not wholly dominate the court's analysis to the exclusion of the other concerns. See Karaha Bodas Co., 335 F.3d at 366.

In performing the balancing of interests, the courts first must answer the threshold questions of whether the parties are the same and whether the resolution of the first filed action would be dispositive of the action to be enjoined. See Northwest Airlines, Inc.,

176 F.Supp.2d at 943. Thereafter, assuming the criteria for injunctive relief have been met, a foreign action should be enjoined (1) when it would frustrate a policy of the forum issuing the injunction; (2) when it would be vexatious or oppressive; (3) when it would threaten the issuing court's in rem or quasi in rem jurisdiction; (4) where the proceedings in the other forum prejudice other equitable considerations; or (5) where adjudication of the same issue in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment. Id.

In Northwest Airlines Inc., Northwest Airlines and a foreign company, R&S, were in dispute with respect to a Sales Agency Agreement ("Sales Contract"). The Sales Contract provided that "any dispute concerning . . . rights or objections based on or relating to this [Sales Contract] shall be referred to and finally settled by arbitration in accordance with the rules of the American Arbitration Association. . ." Northwest Airlines Inc., 176 F.Supp.2d at 938. Northwest Airlines demanded arbitration in Minnesota pursuant to the Sales Contract and R&S initiated a lawsuit in Lebanon with respect to the same disputes. Under these circumstances, the court issued the antisuit injunction against R&S even though the court was "properly wary of interfering in a matter of a foreign sovereign." Id. at 943. The court reasoned that it was "concerned that separate adjudications could result in inconsistent rulings or a race for judgment." Id. The court also found that because no proceedings beyond a filing had occurred in the Lebanese action, the "Court's actions [would] not unduly interfere with the actions of the Lebanese court." Id. Under these circumstances, the court found it was appropriate to issue an antisuit injunction against R&S.

Similar to Northwest Airlines, Inc., the U.K. arbitrations demanded by Sphere

7

Drake and the anticipated U.K. litigation by Sphere Drake concern identical parties and the Seven Agreements at issue in the Amended Petition. Therefore, the Amended Petition, as the first filed action, would be dispositive of the action to be enjoined.

Moreover, U.K. arbitration proceedings and/or litigation are counter to and would frustrate the process of this Court's jurisdiction as well the policy behind M.G.L. c. 175 B §1 et. seq. pursuant to which the Massachusetts Insurance Commissioner is considered lawful attorney for service of process on unauthorized foreign reinsurers such as Sphere Drake. The policy effected is to avoid the burden, delay, costs and risks for companies such as John Hancock, in having to pursue a dispute in a foreign jurisdiction. See M.G.L. c. 175 B §1. Additionally, this U.S. action is appropriate as evidenced by the Service of Suit clause of the Seven Agreements. Allowing Sphere Drake to pursue competing U.K. arbitrations and/or litigation will lead to undue burden, delay, cost and risk of inconsistent results with regard to the disputes concerning the Seven Agreements.

Perhaps most importantly, John Hancock will lose its bargained for right to have any disputes under the Seven Agreements take place in the United States pursuant to Massachusetts law and jurisdiction. If the English arbitration and litigation are allowed to proceed, John Hancock faces the precise risk it bargained and contracted to avoid – litigation and arbitration in a foreign jurisdiction. Such harm to John Hancock would be immediate and irreparable. See Northwest Airlines, Inc., 176 F.Supp.2d at 941 (irreparable would result if foreign company is allowed to pursue claim in Lebanon where contract provided disputes were to be settled by arbitration in the United States.)

Sphere Drake's previous and anticipated actions are designed to circumvent this Court's jurisdiction and to compel John Hancock to litigate and/or arbitrate the same

issues in two different continents in a race to judgment. Under these circumstances, an antisuit injunction is warranted to preserve the status quo, prevent irreparable harm and to avoid oppressive and vexatious burdens being placed on John Hancock.

**B.      John Hancock is Entitled to A Temporary Restraining Order and a Preliminary Injunction.**

       **1.      <u>Standard of Injunctive Relief</u>**

As stated above, in determining whether to issue an antisuit injunction, a court must also review the standard for injunctive relief. The First Circuit requires the party seeking such relief to demonstrate the following: (1) a likelihood of success on the merits: (2) a risk of irreparable injury if the relief is not granted; (3) that petitioner's injury, if the injunction is not granted, outweighs any injury to the respondent; and (4) that the public interest will not be adversely affected by granting the injunction. <u>See</u> <u>e.g.</u>, <u>Securities and Exchange Comm'n v. Fife</u>, 311 F.3d 1, 8 (1st Cir. 2002); <u>Langlois v. Abington Housing Auth'y</u>, 207 F.3d 43, 47 (1st Cir. 2000). John Hancock satisfies each of these requirements.

       **2.      <u>Likelihood of Success on the Merits</u>**

As set forth in the Amended Petition, it is clear from the intent of the parties, as reflected in the contractual documentation evidencing the Seven Agreements, and the course of conduct between them that any arbitration proceedings thereunder are to take place in the United States, governed under the law and procedure of Massachusetts and subject to the jurisdiction of the courts in Massachusetts.

             **a.      Contractual Documentation for the Seven Agreements Indicates that the Parties Intended To Arbitrate Disputes in the United States Subject to the Law and Jurisdiction of the <u>Commonwealth of Massachusetts.</u>**

###### i.      Realm Agreements and Quota Share Agreement

The Realm Agreements and the Quota Share Agreement are all evidenced by contractual documentation consisting of a Slip, a Covernote and an unsigned Wording. (See Amended Petition, ¶10.) The Slips and Covernotes for the Realm Agreements provide for an "Arbitration Clause." (See Amended Petition, ¶12, Pet. Ex. 1(a) and (b); Pet. Ex. 2(a) and (b); Pet. Ex. 3(a) and (b); Pet. Ex. 4(a) and (b); and Pet. Ex. 5(a) and (b).)

Consistent with this language, the wordings for the Realm Agreements provide as follows:

> ARBITRATION CLAUSE
>
> **Disputes between the parties arising out of this Reinsurance which cannot be resolved by compromise,** including but not limited to any controversy as to the validity of this Reinsurance, whether such disputes arise before or after termination of this Reinsurance **shall be submitted to arbitration**.
> \* \* \*
> **[A]ll proceedings pursuant hereto shall be governed by the law of the State of Massachusetts, U.S.A.**

(emphasis added). (See Amended Petition, ¶13, and Pet. Ex.1(c), Art. 26; Pet. Ex.2(c), Art. 26; Pet. Ex.3(c), Art. 25; Pet. Ex.4(c), Art. 25; and Pet. Ex.5(c), Art. 25.)

In addition, the wordings for the Realm Agreements contain a Law and Jurisdiction Clause which provides as follows:

> [t]his Reinsurance shall be governed and construed in accordance with the laws of the state of Massachusetts, U.S.A. under the jurisdiction of the courts of the state of Massachusetts, U.S.A.

(See Amended Petition ¶14, and Pet. Ex. 1(c), Art. 25; Pet. Ex. 2(c), Art. 25; Pet. Ex. 3(c), Art. 24; Pet. Ex. 4(c), Art. 24; and Pet. Ex. 5(c), Art. 24.)

Similar to the Realm Agreements, the Slip and Covernote for the Quota Share

Agreement also provide that the Agreement is subject to an "Arbitration Clause." (<u>See</u> Amended Petition ¶15, and Pet. Ex.6 (a) and (b) thereto.) In accordance with the Quota Share Agreement's Slip and Covernote, the wording for the Quota Share Agreement, provides, in relevant part:

> ARBITRATION
>
> Should any difference of opinion arise between the Reinsurer and the Cedant which cannot be resolved in the normal course of business with respect to the interpretation of this Agreement or the performance of the respective obligations of the parties under this Agreement, **the difference shall be submitted to arbitration**.
>      * * *
> **The laws of the State of Massachusetts shall govern the arbitration.**

(emphasis added). (<u>See</u> Amended Petition, ¶16 and Pet. Ex.6(c), Art. XIV.)

Furthermore, the contractual documentation for the Realm Agreements and the Quota Share Agreement contain Service of Suit clauses that require Sphere Drake to submit to a court of competent jurisdiction in the United States. Service of suit clauses are included in reinsurance contracts entered into between U.S. cedents and foreign reinsurers in order that cedents are not forced to pursue litigation in a foreign jurisdiction in the event of a dispute thereunder. <u>See</u> Barry R. Ostrager and Mary Kay Vyskocil, Modern Reinsurance Law and Practice, §2.03[g] (2000)(purpose of the service of suit clause is to permit courts to exercise personal jurisdiction over a foreign or alien insurer); <u>International Surplus Lines Ins. Co. v. University of Wyo. Research Corp.</u>, 850 F.Supp. 1509, 1528 (D. Wyo. 1994)("the purpose behind a service of suit clause is to protect the insured from having to litigate in an inconvenient forum selected by the insurer.")

Specifically, the Slips and Covernotes for the Realm and Quota Share Agreements provide that each Agreement will contain a "Service of Suit Clause U.S.A." (<u>See</u>

Amended Petition, ¶17 and Pet. Ex. 1(a) and (b); Pet. Ex. 2(a) and (b); Pet. Ex. 3(a) and

(b); Pet. Ex. 4(a) and (b); Pet. Ex. 5(a) and (b); and Pet. Ex. 6(a) and (b).)  In accordance

with the Slips and Covernotes, the wordings contain Service of Suit clauses which

provide, in relevant part, as follows:

> It is agreed that in the event of the failure of the Reinsurers hereon
> to pay any amount claimed to be due hereunder, **the Reinsurers**,
> hereon . . . **will submit to the jurisdiction of a court of**
> **competent jurisdiction within the United States.**

(emphasis added). (See Amended Petition, ¶18 and Pet. Ex. 1(c), Art. 12; Pet. Ex. 2(c),

Art. 12; Pet. Ex. 3(c), Art. 11; Pet. Ex. 4(c), Art. 11; Pet. Ex. 5(c), Art. 11; and Pet. Ex.

6(c) Art. XV.)

    The abundance of language within the contractual documentation of the Realm

Agreements and the Quota Share Agreement requiring the law and jurisdiction of the

State of Massachusetts and mandating suit within the United States is a clear reflection

that the parties intended any arbitration proceedings relating to these Agreements to occur

within the jurisdiction of the United States subject to Massachusetts law and procedure.

### ii.    95% Facility Quota Share Agreement

    The 95% Quota Share Agreement is part of an overall pre-existing reinsurance

program (the "Facility Quota Share Program") in which various reinsurers or

retrocessionaires participated, in varying percentages, in exchange for premium payments

from John Hancock.  (See Welch Aff., ¶ 5.)  Although 1998 was Sphere Drake's first

year of participation, the Facility Quota Share Program had been in force and continually

renewed since 1991.  (See Welch Aff., ¶ 6 and Exemplar Wording for the Facility Quota

Share Program attached as Pet. Ex. 8.)

    The 95% Quota Share Agreement is evidenced by a Slip and Covernote.  (See

Amended Petition, ¶19 and Pet. Ex. 7(a) and (b).)  As with the Slips and Covernotes to

the Realm Agreements and the Quota Share Agreement, the Slip and Covernote for the

95% Facility Quota Share Agreement provide for an "Arbitration Clause" and a "Service

of Suit Clause."  (See Amended Petition, ¶¶ 20 and 21 and Pet. Ex. 7(a) and (b).)  All

previous wordings to the 95% Facility Quota Share Agreement contain an Arbitration

Clause providing, in relevant part:

> As a condition precedent to any right of action hereunder, **any
> dispute or difference hereafter arising** with reference to the
> interpretation, application, or effect of this Agreement or any part
> hereof, whether arising before or after termination of this
> Agreement, **shall be referred to a Board of Arbitration . . . The
> seat of the Board of Arbitration shall be in Massachusetts,
> unless the disputants agree otherwise.**

(emphasis added) (See Amended Petition, ¶24, Welch Aff., ¶ 6 and Pet. Ex. 8, Art. XIX.)

All previous wordings to the 95% Facility Quota Share also contained a Service

of Suit Clause which provided, in relevant part:

> In the event of the failure of the Retrocessionaires hereon to pay
> any amount claimed to be due hereunder, the Retrocessionaires, at
> the request of the Retrocedent, will submit to the jurisdiction of
> any court of competent jurisdiction within the United States. . .

(See Amended Petition, ¶25, Welch Aff., ¶ 6 and Pet. Ex. 8, Art. XVIII.)

Moreover, all previous wordings for the Facility Quota Share Program contain a

Governing Law clause which provides, in relevant part:

> [t]his Agreement shall be governed by and construed in accordance with
> the laws and regulations of the Commonwealth of Massachusetts.

(See Amended Petition, ¶ 26, Welch Aff., ¶ 6 and Pet. Ex. 8, Art. XX.)

It is clear that the parties intended to have the contracts governed by and

construed in accordance with the laws of the State of Massachusetts and to have any

arbitration relating to the 95% Facility Quota Share occur in Massachusetts subject to
Massachusetts law and procedure in accordance with the prior course of dealing
regarding the Facility Quota Share Program.

> b.    **Course of Conduct Between the Parties Dictates that the Seven
> Agreements are to be Arbitrated in the United States Subject
> to Massachusetts Law and Jurisdiction.**

The parties followed a general practice that the reinsurance agreements between
them, and any resulting arbitrations, would be subject to the law and jurisdiction of the
ceding company's home forum, in this case Massachusetts. Between 1997 and 1998,
John Hancock and Sphere Drake entered into twenty-nine (29) reinsurance agreements,
under which John Hancock was the retrocedent and Sphere Drake was the
retrocessionaire. (See Amended Petition, ¶28.) Contractual documentation for nineteen
(19) of these agreements, including the Seven Agreements, specifically provides that the
agreements (including the arbitration clause) are to be subject to the law and jurisdiction
of Massachusetts consistent with the course of conduct between the parties. (See
Amended Petition, ¶¶13, 14, 16 and 30.) Additionally, the 95% Facility Quota Share was
a renewal of a continuous program which had been in place since 1991. Consistent with
the course of conduct between the parties, the wordings for all of the previous years had
provided that the contract was subject to the law and regulations of Massachusetts. (See
Welch Aff., ¶6 and Pet. Ex. 8 Art., XX.)

The only time this general practice was not followed was when LMX or other
London Market business was being reinsured or the underlying contract to the John
Hancock/Sphere Drake Ceded Contract required application of English law. (See
Amended Petition, ¶31.) For example, the contractual documentation for eight (8) of the

additional agreements in which John Hancock is the retrocedent and Sphere Drake is the retrocessionaire specifically provide that the agreements (including the arbitration contracts) will be construed in accordance with English law under the jurisdiction of the English courts. These agreements were specifically made subject to English law and jurisdiction because they expressly reinsure LMX business and specifically provide that the agreements are "placed upon the terms and conditions more specifically defined in the Standard Wording LMX PA1 . . ." (See Pet. Ex. 10(a).)

Moreover, the parties entered into a "facultative" retrocession of a reinsurance agreement which was (including the arbitration clause) specifically to be governed by and construed in accordance with English law under the jurisdiction of the English courts.[2] (See Pet. Ex. 10(b).) In following the form of the underlying contract, the agreement between John Hancock and Sphere Drake also provided that it (including the arbitration clause) was to be governed by and construed in accordance with English law under the jurisdiction of the English courts. (Id.)

Noticeably, none of the contracts which are governed by and construed in accordance with English law and under the jurisdiction of the English courts contains a "Service of Suit Clause U.S.A." (See Amended Petition, ¶31.) Instead, where English law and jurisdiction was to apply, the slips are either silent as to a service of suit clause or simply provide for a "Service of Suit Clause, if applicable." (For Example See Pet. Ex. 10(a).)

In sum, the business reinsured under the Seven Agreements is primarily if not exclusively U.S. workers' compensation business and the Seven Agreements do not

---

[2]"Facultative" reinsurance is individual risk reinsurance, while "treaty" reinsurance is reinsurance of all risks in a general line or class.

contain standard LMX wording or specific reference to English law as distinguished from the contracts governed by English law and none of the contractual documentation for the Seven Agreements specifically provides that they are to be governed and construed under English law. Rather, the contractual documentation for each of the Seven Agreements contains language that it is to include a "Service of Suit Clause U.S.A," and are to be subject to the law and jurisdiction of Massachusetts.

Consistent with the parties' intent and course of conduct, John Hancock has demonstrated a strong, indeed overwhelming, likelihood of success on the merits of its Amended Petition whereby the arbitration proceedings for the Seven Agreements should proceed in the United States subject to Massachusetts law and jurisdiction.

**3.    John Hancock Will Suffer Irreparable Injury Unless Immediate Injunctive Relief is Granted.**

In <u>Northwest Airlines Inc.</u>, in which Northwest Airlines demanded arbitration in Minnesota pursuant to the Sales Contract and the R&S initiated a lawsuit in Lebanon with respect to the same disputes, the court found that Northwest Airlines would suffer irreparable harm if injunctive relief was not granted. The court reasoned that if the Lebanese company were allowed to pursue its claim in Lebanon, Northwest Airlines would face "the precise risk it bargained and contracted to avoid" by being "forced to confront an unfamiliar forum applying unfamiliar law" rather than the bargained for arbitration proceeding in accordance with AAA rules and procedures. <u>Id</u>. at 941. The court ruled that failure to issue a preliminary injunction would "subject [Northwestern Airlines] to the risk of simultaneous litigation in Lebanon, and the corresponding risk and uncertainty of inconsistent rulings, further constituting irreparable harm. <u>Id</u>. Under these

circumstances, the court issued the antisuit injunction. See also Allendale Mutual Ins. Co. v. Bull Data Systems, Inc., 10 F.3d 425 (7th Cir. 1993) (requiring the plaintiff to proceed in two courts at once constitutes "irreparable harm"); International Fashion Products, B. V., v. Calvin Klein, Inc., 1995 U.S. Dist. LEXIS 2598, *3-4 (S.D.N.Y. Mar. 7, 1995), (court found irreparable harm in part due because compelling a company to litigate the action on two continents would subject it to inconsistent rulings and the agreement at issue clearly stated that New York was the chosen forum for all disputes.); Garpeg v. U.S., 583 F.Supp. 789 (S.D.N.Y. 1984) (presumed irreparable harm where there was the potential of being "subject to conflicting orders of two courts of competent jurisdiction" and company would "be in a legal, financial and public relations predicament.")

Similarly, John Hancock will suffer immediate and irreparable harm if the Court does not issue injunctive relief. If the English arbitrations and/or litigation are allowed to proceed, John Hancock will lose the benefit of U.S. arbitration proceedings that it bargained for when it entered into the Seven Agreements.

Moreover, by forcing John Hancock into a foreign arbitration forum contrary to the terms of the Seven Agreements, it will be subject to foreign law and procedure that differ drastically from the FAA. Some of the differences include, among other things, the following: the application the English Arbitration Act of 1996 rather than the FAA; a different process for selection of the arbitrators; different role of the arbitrators; different rules with respect to communication with arbitrators; different rules with respect to the taking of discovery; different standards of equity; and different standards for appeal. In fact, arbitration procedures under English law are alien in almost every aspect to those

under the FAA.

Finally, absent injunctive relief, John Hancock will be forced to litigate the same action on two continents, thereby incurring duplicative costs and expending duplicative resources for actions with respect to the same Seven Agreements with the end result being potentially inconsistent rulings. Such irreparable harm can only be avoided by immediate injunctive relief.

> **4.    John Hancock's Injury, if Relief is Not Granted, Outweighs Any Injury to Sphere Drake.**

The severity of the harm to John Hancock as outlined above, greatly outweighs any potential harm to Sphere Drake that would occur as a result of an injunction preventing Sphere Drake from initiating or moving forward on proceedings in England or elsewhere relating to the Seven Agreements. Indeed, any potential injury to Sphere Drake as a result of injunctive relief in this action would be minimal, because Sphere Drake would simply be required to respond to the Amended Petition before this Court in accordance with the Seven Agreements, and as contemplated by the Service of Suit clauses in the Seven Agreements.

> **5.    The Public Interest Will Not be Adversely Affected.**

"[T]he public interest is served by promoting stability in international contracts by enforcing bargained for arbitration," and law and jurisdiction clauses. See Northwest Airlines, Inc., 176 F.Supp.2d at 942-943. As in Northwest Airlines, Inc., there is public interest in enforcing the Seven Agreements as intended between Sphere Drake and John Hancock by way of U.S. arbitrations subject to Massachusetts law and jurisdiction. See also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983) (citing the liberal federal policy of enforcing contracts to arbitrate.)

There also is a public interest in having this Court preside over actions between a Massachusetts company and its foreign reinsurer. Indeed, Massachusetts law provides jurisdiction over a foreign company which reinsures a Massachusetts corporation for this very reason. See M.G.L. c. 175B, §1 et. seq. and c. 223A §3. Without such jurisdiction cedents such as John Hancock are placed in the precarious situation of litigating the action in the foreign company's home forum rather than in Massachusetts. There is no bona fide reason for parallel English arbitration proceedings that Sphere Drake has demanded and/or English litigation which Sphere Drake is anticipated to initiate, other than to circumvent this Court's jurisdiction and irreparably deprive John Hancock of the forum for which it bargained.

### III.    CONCLUSION

Accordingly, for the reasons stated herein and in the Amended Petition, John

Hancock requests that a temporary restraining order and a preliminary injunction order be

entered in accordance with the Motions for a Temporary Restraining Order and

Preliminary Injunction.

Respectfully Submitted,

Mitchell S. King, Esq. BBO#272810
Rhonda L. Rittenberg, Esq. BBO# 550498
Michael A. Calawa, Esq. BBO# 643517
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Of Counsel
David A. Silva, Esq.
Mound, Cotton, Wollan & Greengrass
One Battery Park Plaza
New York, New York 10004
(212) 804-4200

Attorneys for
John Hancock Life Insurance Company

Dated: February 4, 2004

### CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of February, 2004, I served a copy of the foregoing
Memorandum Of Law In Support Of Petitioner's Motions For A Temporary Restraining
Order And Preliminary Injunction by hand to the law firm Sally & Fitch and by regular
mail to the law firm Butler Rubin Saltarelli & Boyd.

Mitchell S. King, Esq. BBO#272810