IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------------

In the Matter of the Arbitration Proceedings Between

JOHN HANCOCK LIFE INSURANCE COMPANY,
    Petitioner,

       and

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

-------------------------------------------------------------------

Civil Action No. 04 10181
MLW

## MEMORANDUM OF LAW IN SUPPORT OF SPHERE DRAKE'S MOTION TO DISMISS OR STAY JOHN HANCOCK'S PETITION TO COMPEL ARBITRATION PROCEEDINGS

John Hancock Life Insurance Company ("Hancock") has petitioned this Court for an

order compelling Sphere Drake Insurance Limited ("Sphere Drake" or "SD") to submit to

arbitration in Massachusetts to resolve disputes concerning seven putative reinsurance contracts.[1]

Hancock has done so in order to avoid arbitration over the enforceability of the Contracts in

England, where a Commercial Court judge, applying the criminal standard of proof, recently

found that Hancock's agent committed fraud against Sphere Drake in placing these very

Contracts. In support of its Petition, Hancock relies on documents that it claims "evidence"

Sphere Drake's "intention" to arbitrate disputes arising out of the Contracts in Massachusetts

utilizing Massachusetts law. However, Hancock's "evidence" consists of unsigned documents

---

[1] Sphere Drake refers to these seven putative contracts as the "Contracts." In addition to the seven Contracts, Sphere Drake and Hancock are parties to 22 other putative contracts, all of which require disputes to be submitted to arbitration. Unlike the seven Contracts presently before this Court, the other 22 contracts contain provisions that specify where the arbitration is to take place – some select England as the forum for the arbitration while others select Massachusetts. As explained herein, the seven Contracts at issue do not contain a forum selection clause or otherwise specify where arbitration arising out of the Contracts is to take place. In referring to the 29 agreements between the parties as "contracts" and in agreeing to submit to arbitration to resolve disputes arising out of those agreements, Sphere Drake does not agree that any of the "contracts" is a valid or enforceable contract. As described in the Affidavit of Raymond Gordon Bell ("Bell Aff."), submitted herewith, Sphere Drake's position is that the 29 Sphere Drake-Hancock contracts, including the seven Contracts before this Court, are void.

never agreed to or even seen by Sphere Drake or its agent. Indeed, the Contracts are evidenced solely by slips,[2] which were placed in London by London brokers with London underwriting agents purporting to bind a London insurance company. Not only did all of the relevant contract formation activity (such as it was) take place in London, all of the relevant witnesses to the contract formation reside in England.

While it is obvious that England is the appropriate situs for the arbitration to resolve the parties' disputes over the Contracts, it is also quite obvious why Hancock has gone to such lengths to attempt to have the arbitration take place outside England. As Hancock knows, all or virtually all of the witnesses to the fraud committed by Hancock's agent – a fraud that renders the Contracts void and unenforceable – reside in England and would thus be beyond the subpoena power of an arbitration panel sitting in Massachusetts. Sphere Drake has thus commenced arbitration proceedings in England over the same Contracts, and has initiated an action in the English Commercial Court to compel Hancock to participate in the English arbitration.

Since Sphere Drake has agreed to arbitrate the dispute over the enforceability of the Contracts, the only issue before the Court is where the arbitration should be held. Hancock's representations notwithstanding, the Contracts evidence no agreement between the parties as to the proper situs of the arbitration. Yet under Section 4 of the Federal Arbitration Act ("FAA"), this Court can only order the parties to arbitrate in "the district in which the petition for an order directing such arbitration is filed" – that is, in Massachusetts. 9 U.S.C. § 4. As explained in detail herein, England is the only appropriate place for the arbitration to proceed. Accordingly,

---

[2] A slip is an abbreviated form of reinsurance contract which "contains the commitment by the reinsurer(s) acknowledging the contract and summarizing its terms." Eugene Wollan, Handbook of Reinsurance Law § 6.06(A) (2003 Supp.).

Sphere Drake respectfully requests that this Court, under the doctrine of international abstention, dismiss Hancock's Petition, or in the alternative, stay these proceedings pending the outcome of the English proceedings.

## BACKGROUND

### A.     The English Judgment

In January 1997, Sphere Drake entered into an agency agreement (the "Binding Authority") pursuant to which Sphere Drake granted authority to Euro International Underwriting Limited ("EIU") to underwrite certain types of reinsurance risks on Sphere Drake's behalf. (Bell Aff., ¶ 5.) Over the course of almost two years, EIU wrote 119 reinsurance contracts purportedly pursuant to the Binding Authority. (*Id.*, ¶ 7.) London brokers Stirling Cooke Reinsurance Brokers Limited and Stirling Cooke Insurance Brokers Limited (collectively "Stirling Cooke" or "SCB") placed 112 of these putative contracts, including the 29 contracts reinsuring Hancock. (*Id.*)

Sphere Drake subsequently discovered that Stirling Cooke and EIU had colluded to defraud Sphere Drake. (*Id.*, ¶¶ 6, 9.) In 2000, Sphere Drake filed a lawsuit in the Commercial Court in England against EIU, Stirling Cooke, and the principals of those two entities (including Nick Brown and Jeff Butler, the directors of Stirling Cooke who actually placed the business at issue). (*Id.*, ¶ 9.) In that action, Sphere Drake alleged that EIU and its principals John Whitcombe and Christopher Henton dishonestly breached the fiduciary duties they owed to Sphere Drake, that Stirling Cooke and its principals Brown and Butler dishonestly assisted in EIU's breach, and that Stirling Cooke (including Brown and Butler) and EIU (including Whitcombe and Henton) conspired to use unlawful means with the intention of injuring Sphere Drake.

In 2002, Justice Thomas (now Lord Justice Thomas, sitting on the Court of Appeals) heard the case during 110 trial days and, in July 2003, issued a lengthy and detailed judgment. (*Id.*, ¶¶ 9-10; *see also Sphere Drake Ins. Ltd. v. Euro Int'l Underwriting Ltd.,* Case No. 2000 Folio 249, 2003 WL 21729222 (Q.B. July 8, 2003) (the "Judgment").)[3] Applying the criminal standard of proof to the allegations of dishonesty (Judgment, Part I at ¶ 107, Bell Aff. Ex. H Tab 8), Lord Justice Thomas found that the contracts Stirling Cooke placed with EIU under the Binding Authority – including the seven Contracts at issue in this action[4] that Stirling Cooke placed on behalf of and as agent for Hancock – were accepted by EIU in dishonest breach of the fiduciary duties EIU owed to Sphere Drake. Justice Thomas further found that Stirling Cooke knew that Sphere Drake had not authorized EIU to write the type of business at issue and that Stirling Cooke had dishonestly assisted EIU in its dishonest breach of the duties owed by it to Sphere Drake. In particular, Lord Justice Thomas found, using the "beyond a reasonable doubt" standard of proof:

- "SD were not told that gross loss making business[5] would be written against reinsurers when they agreed to write the binder; *EIU knew that they were not authorized to write such business*" (Judgment, Part I at ¶ 873, Bell Aff. Ex. B Tab 4 (emphasis added));

- "SCB were aware that SD did not know that SD had become participants in writing gross loss making business on the back of reinsurance; the placing of Programmes 2 and 3 with EIU and all subsequent placings were therefore effected

---

[3] The Judgment is more than 500 pages long and has thus not been attached in full as an exhibit. Portions of the Judgment referred to herein are attached to the Bell Affidavit at Exhibits B, G and H. Sphere Drake will furnish a complete copy of the Judgment to the Court if the Court so requests.

[4] Adopting Hancock's shorthand, the Contracts at issue in this proceeding are the five layers of the "Specific Realm" Program (referred to as Programme 9 in the Judgment), the Quota Share Agreement (Programme 33), and the Facility Quota Share Agreement (Programme 28). In the English action and the Judgment, related contracts, i.e., different layers of coverage for the same business, were grouped together into "Programmes" (Bell Aff. , ¶ 7.)

[5] The phrase "gross loss making business" was used in the Judgment to denote "[b]usiness on which it was virtually inevitable, from the information presented, that the losses under the reinsurance would exceed the premium by a substantial margin." (Judgment, Part I, ¶ 151.)

by SCB when they knew that SD had not approved the writing of this type of business" (Judgment Part I at ¶ 1862(viii), Bell Aff. Ex. B Tab 6);

- "I am therefore sure that SCB dishonestly assisted EIU in the writing of all the business that was written by EIU for SCB and its clients, and that this was done from no later than 3 February 1997. . . . *[SCB] therefore knew, prior to the confirmation of Programmes 1, 4 and 5,[6] that the business was being accepted by EIU without the authority of SD and that SD were ignorant of the true nature of the business"* (Judgment Part I at ¶ 888, Bell Aff. Ex. B Tab 4 (emphasis added)); and

- "there was a collusive arrangement between SCB and EIU, the objective of which was to enable gross loss making business to be placed with SD; SCB's purpose was to find a source of reinsurance for their US business which they could ruthlessly exploit and earn commission. EIU's purpose was to earn commission." (Judgment Part I at ¶ 1865(i), Bell Aff. Ex. B Tab 6.)

In sum, Lord Justice Thomas found that EIU had no authority to write the business it accepted purportedly on Sphere Drake's behalf, and Stirling Cooke knew that EIU lacked authority to bind Sphere Drake. (*E.g.*, Judgment Part I at ¶ 1862(viii), Bell Aff. Ex. B Tab 6.)

Lord Justice Thomas also made specific findings about the business that Stirling Cooke placed with EIU for Hancock, including the seven Contracts now in dispute. With respect to the Specific Realm Program (Program 9), Lord Justice Thomas found both that "EIU and in particular Mr. Henton acted dishonestly in accepting this programme" and that "Mr. Brown [of SCB] knew that Mr. Henton was acting in dishonest breach of duty by dishonestly assisting him in this." (Judgment Part II at ¶¶ 211-12, Bell Aff. Ex. B Tab 8.) Similarly with regard to the Quota Share Agreement (Program 28), Lord Justice Thomas found that "Mr. Henton acted dishonestly" in accepting the program, and that "Mr. Brown also acted dishonestly." (Judgment Part I at ¶¶ 1675-76, Bell Aff. Ex. B Tab 11.) Lord Justice Thomas also found that "SCB colluded with EIU" to cover up, *inter alia,* the lies SCB had told EIU about the Quota Share

---

[6] EIU confirmed its acceptance of Programs 1 and 4 on February 12, 1997 and Program 5 on February 19, 1997. (Judgment Part I at ¶ 888, Bell Aff. Ex. B Tab 4.)

Agreement. (Judgment Part I at ¶¶ 1680-83, Bell Aff. Ex. B Tab 11.) Finally, with regard to the

Facility Quota Share Agreement (Program 33), Lord Justice Thomas concluded that EIU "acted

dishonestly in accepting this programme" and that "Butler [of SCB] knew that Mr. Henton was

acting in dishonest breach of duty and dishonestly assisted him in this." (Judgment Part II at

¶¶ 654-55, Bell Aff. Ex. B Tab 10.)

## B.    The Contracts

Hancock has represented to the Court that the five Specific Realm Contracts and the

Quota Share Agreement are all evidenced by three sets of documents:

> (a) a signed slip executed by Sphere Drake which identifies salient
> terms and conditions and summarizes the risks to be reinsured;
> (b) a covernote issued by the reinsurance intermediary to John
> Hancock advising of the reinsurance coverage effected with Sphere
> Drake; and (c) an unsigned wording which details the terms and
> conditions of the agreement in accordance with the slip and
> covernote.

(Petition, ¶ 9.) Similarly, Hancock has represented that the 95% Facility Quota Share Agreement

"is evidenced by a signed slip and a covernote," and claims that contractual wordings from prior

years of this program (years in which Sphere Drake did not participate) provide further

"evidence" of the parties agreement. (Petition, ¶¶ 19, 23-26.)

To the contrary, the seven slips are the *only* documents that purportedly "evidence" the

parties' agreement under these seven Contracts. Stirling Cooke prepared the slips on behalf of

Hancock and the slips were executed by EIU, not Sphere Drake. (Exhibits 1(a), 2(a), 3(a), 4(a),

5(a), 6(a), 7(a) to Affidavit of Mitchell S. King ("King Aff.").) The covernotes were documents

issued by Stirling Cooke as Hancock's agent, *to Hancock* to advise the latter of the terms and

conditions of the reinsurance that Stirling Cooke purported to have placed with EIU. (*See*

Petition, ¶¶ 9, 19.) Moreover, Hancock admits, as it must, that neither Sphere Drake nor its

agent EIU ever signed any of the contract wordings submitted with Hancock's Petition as "evidence" of the parties' agreements. (Petition, ¶¶ 9, 23.) Indeed, Hancock has pointed to nothing to establish that Sphere Drake or EIU *ever even saw* these contract wordings. This is because they did not. (Bell Aff., ¶¶ 21-24, 28, 31, 55(1).) The slips themselves are the only documentary evidence of the purported contractual agreements between the parties.

As for the slips themselves, none contains a choice of law provision or a forum selection clause, or even mentions the state of Massachusetts. (King Aff., Exs. 1(a), 2(a), 3(a), 4(a), 5(a), 6(a), 7(a).) Rather, each merely includes the statement "Arbitration Clause" and either "Service of Suit Clause U.S.A." or simply "Service of Suit Clause." (*Id.*)

As explained more fully in the Bell Affidavit, Stirling Cooke offered and EIU, purportedly acting on Sphere Drake's behalf, accepted 22 other reinsurance contracts reinsuring Hancock. (Bell Aff., ¶¶ 32-45.) Unlike the slips for the seven Contracts at issue before this Court, each of the slips for the other 22 contracts specified where any arbitration would take place. (Bell Aff., ¶¶ 32, 34, 38, 42-44.) Pursuant to the terms of the slips, disputes arising out of the Hancock Per JEH Re Contracts (Programme 1) and the JEH Re/Centaur Contract (Programme 24) are to be resolved in arbitration in England, whereas disputes arising out of the Hancock/Hackett Contracts (Programme 5), the Bridgefield Retrocession (Programme 8), the Hancock/WEB VQS Contracts (Programme 30), and the Hancock Direct Contracts (Programme 12) are to be resolved in arbitration in Massachusetts. (*Id.*)

## C.    Proceedings Pending Between the Parties

Hancock has demanded arbitration in Massachusetts on the seven Contracts that contain no choice of law or forum and Sphere Drake has demanded arbitration in England on these same seven Contracts. (Bell Aff. Ex B Tab 18, pages 30-44.) By agreement, both parties' arbitration

demands with regard to these Contracts were effective as of January 26, 2004. (*Id.*, Page 58.) On January 29, 2004, Sphere Drake filed applications in the English Commercial Court to compel Hancock to submit to arbitration over the seven Contracts in England. (Bell Aff., ¶ 63 and Ex. F.) Like the Petition presently before this Court, Sphere Drake's applications to the English Commercial Court seek a determination as to where the arbitration over the seven Contracts should take place. (Bell Aff. Ex. F.)

As explained herein, the English Commercial Court should be permitted to make the determination as to situs of the arbitration over the seven Contracts, as England is the only appropriate place for the arbitration to be held, and in particular, because this Court would have no discretion to order arbitration to proceed in England should it retain jurisdiction over Hancock's Petition. This Court should therefore abstain from exercising its jurisdiction over this issue, and allow the English court to determine the situs of the arbitration.

## ARGUMENT

In the hopes of convincing this Court to compel Sphere Drake to arbitrate in Massachusetts, Hancock attempts to place a domestic spin on the parties' dispute over the enforceability of the Contracts. (*See, e.g.,* Hancock Mem., p. 9 ("the Agreements are United States contracts subject to Massachusetts law and arbitration proceedings in the United States").) However, the parties' dispute, which the parties agree will be resolved in arbitration, centers principally on the issue of contract formation. No matter where the arbitration is conducted, Sphere Drake will maintain that none of the Contracts was validly formed because, as Lord Justice Thomas held, Sphere Drake's agent EIU lacked authority to bind Sphere Drake and Hancock's agent Stirling Cooke knew EIU lacked authority.[7]

---

[7] As the Second Circuit Court of Appeals recognized in a case concerning contracts Stirling Cooke placed with EIU for a different cedent, "if an agent that has been charged with negotiating a contract on behalf of the principal acts

England is the only appropriate place to resolve the parties' current dispute. The negotiation and fraudulent placement of the Contracts took place in England between Stirling Cooke and EIU, both English companies. As Hancock is no doubt aware, going forward with a Massachusetts forum will likely preclude the parties from obtaining live testimony from any of the witnesses with personal knowledge concerning the negotiation, placement, and purported formation of the Contracts. The significance of the situs of the arbitration is thus far greater than simply a matter of convenience to the parties. Since this Court would have no discretion under the FAA to order the arbitration to proceed in England, Sphere Drake requests that this Court abstain from exercising its jurisdiction to allow the English court to determine the situs of the arbitration.

## I. Neither the Full Contract Wordings Nor Covernotes Provides Any Evidence As to What the Parties Agreed.

Defying the most basic concepts of contract law, Hancock seeks to rely on documentation, neither signed nor seen by EIU or Sphere Drake, as "evidence" of Sphere Drake's contractual intent. Indeed, Hancock quotes at length from provisions in contract wordings that Sphere Drake had no say in drafting, that were not negotiated between the parties, that Sphere Drake and its agent never signed, and that were never even forwarded to Sphere Drake or EIU. We have found no case where contractual intent was derived from a document that one of the parties never saw or even knew existed. There certainly could not have been a "meeting of the minds" as to any of the terms in the contract wordings that were not also contained within the slips themselves. *See, e.g., Hinchey v. Nynex Corp.*, 144 F.3d 134, 142 (1st Cir. 1998) ("Clearly, there was no meeting of the minds and hence no contract."). Hancock's

---

outside the scope of its agency, *and the opposing party knows this,* then the agent lacks both actual and apparent authority, and the principal is not bound to the contract, for the contract is void--it never came into legal existence." *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001) (emphasis in original).

reliance on contract wordings is thus wholly inappropriate and the Court should ignore these wordings in reviewing the issue before it.

Hancock's reliance on the covernotes, which were forwarded to *Hancock, not Sphere Drake*,[8] is similarly misplaced. It is well settled that a covernote itself is not a contract, but is merely a confirmation by the broker to his principal of the coverage that has been placed. *See* Eugene Wollan, Handbook of Reinsurance Law § 6.06(A) (2003 Supp.) ("Both [the Placing Slip and the Cover Note] summarize the terms of the placement; indeed, they frequently look very much alike, and they contain essentially the same coverage information. The reinsurer, however, is a party to, and is bound by, only the Placing Slip.") Here, the fact that *Hancock* received copies of the covernotes from its agent Stirling Cooke has no bearing on what Sphere Drake's intentions were.

Hancock spends the majority of its argument citing authority for the unremarkable proposition that, under the FAA, doubts or ambiguities concerning agreements to arbitrate should be resolved in favor of arbitration. (Hancock Mem., pp. 10-12.) However, both parties have already agreed to submit their disputes over the seven Contracts to arbitration. The issue is *where* the disputes should be arbitrated. Hancock bases its argument on the faulty premise that "Sphere Drake has refused to proceed with arbitration *as required by the contractual documentation of the Agreements.*" (*Id.* at 10 (emphasis added).) This is factually wrong. Moreover, as the Supreme Court has recognized, "the federal policy [favoring arbitration] is simply to ensure the enforceability, *according to their terms*, of private agreements to arbitrate." *Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989) (emphasis added). Here, Hancock asks the Court to enforce terms that were never

---

[8] Each of the covernotes is directed to JEH Re Underwriting Management Bermuda Ltd or James E Hackett Reinsurance Corporation, Hancock's underwriting agents. (King Aff., Exs. 1(b), 2(b), 3(b), 4(b), 5(b), 6(b), 7(b).)

agreed to by Sphere Drake. The federal policy favoring arbitration cannot be deemed to go so far as to bind a party to terms that it never negotiated, never saw, and never knew existed.

The unsigned and unseen contract wordings and the covernotes that Stirling Cooke forwarded to Hancock cannot be considered "evidence" of the parties' intention regarding the situs of the arbitration. Rather, to the extent it deems contractual intention relevant, the Court should rely exclusively on the signed placement slips, the only documents actually evidencing the Contracts.

## II. Nothing in the Slips Requires the Arbitration to Take Place in Massachusetts.

When documentation before the Court is properly limited to the reinsurance slips themselves, Hancock has no evidence supporting its contention that Massachusetts is the appropriate forum for arbitrating disputes arising out of the Contracts. Rather, in stark contrast to the situation as represented by Hancock, the truth is that none of the slip clauses cited by Hancock requires or even suggests that the arbitration must or should be held in Massachusetts.

### A. The Service of Suit Clauses Do Not Require the Arbitration to Take Place In a Domestic Forum.

Hancock relies on references to "Service of Suit Clause – U.S.A." in the slips for the Realm Agreements and the Quota Share Agreement[9] in support of its contention that the arbitration must take place in Massachusetts. (Hancock Mem., pp. 5-6.) Hancock's position appears to be that the service of suit provisions in the slips operate as a mandatory forum selection clause requiring Sphere Drake to arbitrate in the United States (and specifically, in Massachusetts). The law is to the contrary.

---

[9] The slip for the Facility Quota Share Agreement also refers to a service of suit clause, but does not specify a location. (King Aff., Ex. 7(a).) Thus, the inclusion of a service of suit clause in the slip for this risk provides no insight whatsoever as to the parties' choice of the situs of the arbitration.

Courts consistently hold that the existence of a service of suit provision in a contract does not preclude a party from initiating or transferring a proceeding to another jurisdiction. In *W.R. Grace & Co. v. Hartford Accident & Indemnity Co.*, 407 Mass. 572, 580 (1990), for example, the Massachusetts Supreme Judicial Court considered this identical issue, and concluded that "a service of suit clause does not lock an insurance company into the jurisdiction selected by its insured nor does such a provision bar a court in that jurisdiction from considering a plea of forum non conveniens." Notwithstanding the service of suit clause in the contract and the fact that the underwriters had selected Massachusetts as the appropriate place for service, the court in *W.R. Grace* concluded that "New York is the logical State in which to resolve the dispute," and therefore affirmed dismissal of the Massachusetts case on *forum non-conveniens* grounds. *Id.* at 575, 581-82.

Other courts have adopted the same approach, holding that a service of suit provision is not a mandatory forum selection clause. *See, e.g., Friar v. TL Dallas (Special Risks) Ltd.*, No. H-02-0030, 2003 WL 22095664, at *4-*5 & n.3 (S.D. Tex. Jan. 27, 2003); *Whirlpool Corp. v. Certain Underwriters at Lloyd's London*, 278 Ill. App. 3d 175, 180 (Ill. App. Ct. 1996); *Price v. Brown Group Inc.*, 206 A.D.2d 195, 199 (N.Y. App. Div. 1994). And, the same reasoning applies where the defendant insurer seeks to submit the dispute to a foreign tribunal. *See Brooke Group Ltd. v. JCH Syndicate*, 87 N.Y.2d 530, 532-34 (1996) (holding that service of suit clause "does not bind the parties to litigate in a particular forum, or give the insured the exclusive right to choose a forum unrelated to the dispute," and affirming trial court's dismissal of the action on forum *non conveniens* grounds in favor of arbitration pending in England).

In this case, the wording in the slips – "Service of Suit Clause U.S.A." – is not a mandatory forum selection clause and does not preclude Sphere Drake from demanding

arbitration in England or from initiating proceedings in England to compel arbitration in England.

**B.     The Classification of the Business as "U.S. Reinsurance" Has No Bearing on the Proper Situs For the Arbitration.**

In addition to the service of suit clauses in the slips, Hancock also relies on the fact that, for the Realm Agreements and the Quota Share Agreement, each slip "identifies the respective contract as a 'U.S. Reinsurance Treaty' or as 'U.S. Reinsurance.'" (Petition, ¶ 11.)[10] Again, Hancock appears to contend that the fact that the slips classified the reinsurance as "U.S. Reinsurance" somehow indicates an intention by the parties to arbitrate in Massachusetts. However, these provisions are of no significance as regards the situs of the arbitration. As the Lloyd's fact sheet (*see* Bell Aff., ¶ 55(4) and Ex. B Tab 20) shows, classification of business as U.S. Reinsurance indicates only that a U.S. cedent may take balance sheet credit for reinsurance provided that certain requirements are satisfied. Accordingly, this provision sometimes appears in slips and contracts that are governed by English law with England as the seat of the arbitration. (Bell Aff., ¶ 55(4).) Indeed, Hancock's position is belied by the fact that Hancock agreed to arbitrate the Hancock Per JEH Re Contracts and the JEH RE/Centaur Contract (Programmes 1 and 24) in England even though the slip for each of those contracts also classifies the business as "U.S. Reinsurance." (Bell Aff. ¶¶ 34, 38-39 and Ex. B Tabs 13, 16.)

**III.    The Court Should Dismiss or Stay This Action Pending the Outcome of the English Proceedings Under the Doctrine of International Abstention.**

Because nothing in the Contracts requires the arbitration to take place in Massachusetts, the Court may abstain from exercising its jurisdiction over this matter, and dismiss or stay this Petition in favor of the proceedings pending in England. In this case, abstention is particularly

---

[10] There is no similar provision in the slip for the 95% Facility Quota Share. (King Aff., Ex. 7(a).)

appropriate, as only the English court can compel the parties to arbitrate in England, and England, where all the key witnesses reside, is clearly the appropriate situs for the arbitration.

The Court of Appeals for the First Circuit has recognized that the "'power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Hewlett-Packard Co. v. Berg*, 61 F.3d 101, 105 (1st Cir. 1995) (quoting *Landis v. North Amer. Co.*, 299 U.S. 248, 254 (1936)). Moreover, "considerations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously." *Boston & Maine Corp. v. United Transp. Union*, 110 F.R.D. 322, 329 (D. Mass. 1986) (citations and quotation marks omitted). At least one court in this District has squarely addressed the issue of abstention in the international context.

In *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248 (D. Mass. 1999), the Court considered a motion to stay or dismiss a Massachusetts District Court action where a similar action was pending in England. *Id.* at 249-50. Dunkin' Donuts brought the original action in England against DD UK. A year later, DD UK and its director and majority shareholder Robert F. Goldhammer filed their own action in federal court in Massachusetts. Dunkin' Donuts responded with a motion to dismiss or stay the Massachusetts action on "international abstention grounds because both actions share overlapping legal and factual issues." *Id.* at 250. The court began its analysis by noting that "[f]ederal courts have the inherent power to stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *Id.* at 251.

The *Goldhammer* court then set forth the

> roster of relevant factors [trial courts have developed] in determining whether to grant a stay because of parallel litigation in a foreign forum: (1) similarity of parties and issues involved in the foreign litigation; (2) the promotion of judicial efficiency;

14

> (3) adequacy of relief available in the alternative forum; (4) issues
> of fairness to and convenience of the parties, counsel, and
> witnesses; (5) the possibility of prejudice to any of the parties; and
> (6) the temporal sequence of the filing of the actions.

*Id.* at 252-53 (citations omitted). The court applied these factors to the facts before it, and

concluded that the "ledger of the factors that guide the Court's discretion in determining whether

to proceed in light of the English action leads to a stay in this action." *Id.* at 255; *see also*

*Hewlett-Packard*, 61 F.3d at 105-06 (staying action to confirm arbitration award for "prudential

reasons" until second arbitration was concluded).

Other federal courts have adopted the approach the court used in *Goldhammer* to

determine whether to dismiss or stay an action in favor of a pending foreign proceeding on

international abstention grounds. *See, e.g., MLC (Bermuda) Ltd. v. Credit Suisse First Boston*

*Corp.*, 46 F. Supp. 2d 249, 251 (S.D.N.Y. 1999) (dismissing federal court action in favor of

action proceeding in England); *Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 954 F. Supp. 101,

103 (S.D.N.Y. 1997) (staying federal court action in favor of action proceeding in Belgium); *see*

*also Finova Cap. Corp. v. Ryan Helicopters U.S.A. Inc.*, 180 F.3d 896, 898 (7th Cir. 1999)

(affirming district court's stay in favor of an action pending in court in St. Lucia). In this case, it

is clear that dismissal or a stay on international abstention grounds is warranted to enable the

English court to decide the issue of arbitration situs.

## A.     Similarity of Parties and Issues

The parties to this action are *identical* to the parties to the pending arbitration in England,

and to the action Sphere Drake initiated in England to compel Hancock to submit to the English

arbitration panel's jurisdiction. Moreover, the factual and legal issues to be decided in each case

are the same. Both this Court and the English Commercial Court have been called upon to

decide, based on identical facts, which forum is the appropriate situs for arbitration. The

eventual arbitration, whether held in Massachusetts or in England, will focus on the same issue –

whether the Contracts were ever validly formed. The first *Goldhammer* factor thus clearly

favors abstention. *See, e.g., Credit Suisse,* 46 F. Supp. 2d at 252 (dismissing under international

abstention doctrine where, *inter alia,* there was "a substantial identity of issues between the two

lawsuits [and] [b]oth cases [arose] from the same set of transactions, and the essential

controversies [were] squarely before the British court").

### B.    Promotion of Judicial Efficiency

This factor also favors abstention. If the Court denies Sphere Drake's motion, both this

Court and the English court will have to decide the same issue: the proper situs of the

arbitration. Courts recognize that such circumstances should be avoided where other factors

favor abstention. *See, e.g., Goldhammer,* 59 F. Supp. 2d at 254 ("Allowing this case to go

forward in tandem with the English case would consume a great amount of judicial,

administrative, and party resources. Also, simultaneous adjudications regarding identical facts

and highly similar legal issues creates the risk of inconsistent judgments.") (citations and

quotation marks omitted). Since only the English Court can order arbitration in England, this

Court should abstain.

### C.    Adequacy of Relief Available in English Forum

This issue goes to the competency of the foreign forum to hear the dispute. It is clear that

the English Commercial Court is fully competent to grant the relief each party is seeking – a

ruling on where the arbitration should be tried. *See Credit Suisse,* 46 F. Supp. 2d at 253 ("The

competence of British courts to adjudicate commercial disputes is beyond question."). Nor does

Hancock have any colorable argument that a resulting arbitration in England would be

inadequate as Hancock has expressly agreed to arbitrate disputes concerning several other

reinsurance contracts with Sphere Drake in England. (Bell Aff. ¶¶ 34, 38 and Ex. B Tabs 13, 16.) This factor thus also weighs in favor of abstention.

### D.    Convenience of Parties, Counsel and Witnesses

In this case, the threshold issue will be whether EIU was without authority to write the Contracts and whether Stirling Cooke knew EIU was without authority. The only witnesses who participated in placing and accepting the Contracts – Whitcombe, Henton, Butler, and Brown – are located in England, as are Sphere Drake, EIU and Stirling Cooke, the relevant entities. (Bell Aff., ¶ 64.) Perhaps most significantly, a Massachusetts arbitration panel will be unable to employ Hague Convention procedures to compel any of the key witnesses to testify in Massachusetts. *See Evergreen,* 954 F. Supp. at 104 (staying action where, *inter alia,* "[w]itnesses and evidence related to this issue will be located in Belgium"). Since all of the people who played any role in the purported formation of the Contracts at issue – and the fraud surrounding that formation – are in England, England is the only sensible situs for the arbitration. Indeed, a Massachusetts arbitration would likely foreclose the parties from presenting live testimony from any of the witnesses with information concerning the fraud perpetrated by Hancock's agent, Stirling Cooke, in placing the Contracts.

### E.    Possible Prejudice

Aside from the fact that Hancock would apparently prefer a domestic forum, moving forward with the English proceedings will not cause Hancock any undue prejudice. The same cannot be said if this Court retains jurisdiction over the situs issue. Under Section 4 of the FAA, the only place this Court can order the parties to arbitrate is within this District. 9 U.S.C. § 4; *see also, e.g., Dempsey v. George S. May Int'l Co.,* 933 F. Supp. 72, 75-76 (D. Mass. 1996) (holding that a "federal court may only order arbitration in the district in which it sits," and transferring action to Northern District of Illinois since contract provided for arbitration in Illinois).

Accordingly, should this court retain jurisdiction, the situs issue would be resolved by default in favor of a Massachusetts arbitration. However, it is clear that England is the only appropriate place for the arbitration to be held. The principals of EIU, Whitcombe and Henton, and of Stirling Cooke, Brown and Butler, will be beyond the reach of subpoena by a Massachusetts arbitration panel. Sphere Drake will, therefore, be severely prejudiced if forced to arbitrate in Massachusetts, since the principals of EIU and Stirling Cooke are the key witnesses with respect to the validity of the Contracts.

### F.    Temporal Sequence of Filing

In this case, timing should play no role in the analysis, since neither this action nor the proceedings Sphere Drake initiated in England has progressed beyond the initial filing stage. *See, e.g., Colorado River Water Conservation Dist. v. US*, 424 U.S. 800, 820 (1976) (finding significant, in holding that abstention was proper, "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss").

Because the relevant factors in an international abstention analysis strongly favor abstention, this Court should dismiss or a stay Hancock's Petition in favor of the proceedings currently pending in England.

### IV.    The Federal Arbitration Act Does Not Prevent This Court From Abstaining.

In certain circumstances, federal courts have decided not to abstain from exercising their jurisdiction to resolve motions to compel arbitration under the FAA. *See Cashman Equip. Corp. v. Kimmins Contracting Corp.*, No. 03-10463, 2004 WL 32961, at *7 (D. Mass. Jan. 5, 2004) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1 (1983)). However, in this case, abstention is appropriate notwithstanding the fact that Hancock seeks to compel arbitration. Neither *Cashman* nor *Moses Cone* addresses the issue of whether a court should abstain in favor of an action pending in a foreign jurisdiction, but rather considered abstention in

favor of another action pending in a state court. *See Cashman*, 2004 WL 32961, at *1-*2; *Moses Cone*, 460 U.S. at *7; *see also Paul Revere Variable Annuity Ins. Co. v. Thomas*, 66 F. Supp. 2d 217, 220-23 (D. Mass. 1999).   As the Supreme Court explained, one of the

> important reason[s] against allowing a stay is the probable
> inadequacy of the state-court proceeding to protect Mercury's
> rights. . . .  [I]t suffices to say that there was, at a minimum,
> substantial room for doubt that Mercury could obtain from the state
> court an order compelling the Hospital to arbitrate.

*Moses Cone*, 460 U.S. at 26-27.  Of course, the concern expressed by the Court in *Moses Cone* is not implicated in this case, as there is no doubt that the English court is competent to determine the issue of the appropriate situs for the arbitration.  Accordingly, this Court is not precluded from exercising its discretion to dismiss or stay this action in favor of the pending English proceedings.

     While few courts have considered the interplay between the FAA and abstention in the international context, those that have analyzed the issue have concluded that the FAA does not preclude international abstention.  In *Pepsico Inc. v. Oficina Central de Asesoria Y Auday Tecnica, C.A.*, 945 F. Supp. 69, 70-71 (S.D.N.Y. 1996) petitioners moved to compel arbitration and respondents, while conceding that the court had jurisdiction and the power to compel arbitration, "ask[ed] the Court to decline jurisdiction as a matter of international comity" in favor of a proceeding pending in Venezuela.  The court held that abstention was appropriate under the circumstances to enable the Venezuelan court to determine a threshold issue that was subject to Venezuelan law.  *Id.* at 71.  In *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1222-24 (9th Cir. 1989) the issue was whether the district court properly abstained from deciding a motion to compel arbitration where an action on the same contract was pending in a tribal court.  The Court of Appeals affirmed the district court's ruling,

holding that it "was proper for the district court to defer [to the Tribal Court] on the grounds of comity." *Id.* at 1230.

The courts' decisions in *Pepsico* and *Stock West* establish that abstention is appropriate in the international context even where abstention would involve a court's decision not to resolve a motion to compel arbitration. This conclusion is further supported by cases outside the international context which have held that courts can abstain or stay proceedings in the face of a motion to compel arbitration in a variety of instances. *See, e.g., Hewlett-Packard,* 61 F.3d at 105-06 (*supra* at 15); *Doughty v. Underwriters at Lloyd's, London,* 812 F. Supp. 13, 13-15 (D. Mass. 1993) (abstaining from exercising jurisdiction over motion to compel arbitration and remanding case to state court); *Cigna Healthcare of St. Louis, Inc. v. Kaiser,* 294 F.3d 849, 851-55 (7th Cir. 2002) (affirming district court's abstention of exercise of jurisdiction over motion to compel arbitration in favor of pending parallel state court proceeding). Thus, *Moses Cone* notwithstanding, it is clear that abstention is appropriate where circumstances warrant its application, even in the face of a motion to compel arbitration.

This Court should dismiss or stay this action, on international abstention grounds, in favor of the proceedings currently pending in England.

## CONCLUSION

For all of the foregoing reasons, Respondent Sphere Drake respectfully requests that this Court abstain from exercising its jurisdiction over this Petition and either dismiss this Petition or stay it pending the outcome of the English proceedings.

SPHERE DRAKE INSURANCE LIMITED
By its attorneys,

Andrea Peraner-Sweet (BBO#550515)
SALLY & FITCH
225 Franklin Street
Boston, MA 02110
(617) 542-5542

OF COUNSEL:
Harold C. Wheeler (Attorney I.D. No. 2996960)
Teresa Snider (Attorney I.D. No. 06210115)
Kevin J. O'Brien (Attorney I.D. No. 06193882)
Mark A. Schwartz (Attorney I.D. No. (6270580)
Butler, Rubin, Saltarelli & Boyd LLP
3 First National Plaza
70 West Madison Street, Suite 1800
Chicago, Illinois 60602
(312) 444-9660

## CERTIFICATE OF SERVICE

I, Andrea Peraner-Sweet, hereby certify that copy of this document was served upon all counsel of record by first-class mail, postage pre-paid on February 4, 2004.

Andrea Peraner-Sweet

W:\S\Sphere\Hancock\Pleadings\motion to dismiss or stay final.doc