IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------

In the Matter of the Arbitration Proceedings Between

JOHN HANCOCK LIFE INSURANCE COMPANY,
     Petitioner,

     and

SPHERE DRAKE INSURANCE LIMITED,
     Respondent.

---------------------------------------------------------------

Civil Action No. 04 10181
MLW

## MEMORANDUM OF LAW IN SUPPORT OF SPHERE DRAKE'S MOTION TO DISMISS OR STAY JOHN HANCOCK'S VERIFIED AMENDED PETITION TO COMPEL ARBITRATION PROCEEDINGS

John Hancock Life Insurance Company ("Hancock") has petitioned this Court for an

order compelling Sphere Drake Insurance Limited ("Sphere Drake" or "SD") to submit to

arbitration in Massachusetts to resolve disputes concerning seven putative reinsurance contracts.[1]

Hancock has done so in order to avoid arbitration over the enforceability of the Contracts in

England, where a Commercial Court judge, applying the criminal standard of proof, recently

found that Hancock's agent committed fraud against Sphere Drake in placing these very

Contracts. In support of its Petition, Hancock relies on documents that it claims "evidence"

Sphere Drake's "intention" to arbitrate disputes arising out of the Contracts in Massachusetts

utilizing Massachusetts law. However, Hancock's "evidence" consists of unsigned documents

---

[1] Sphere Drake refers to these seven putative contracts as the "Contracts." In addition to the seven Contracts, Sphere Drake and Hancock are parties to 22 other putative contracts, all of which require disputes to be submitted to arbitration. Unlike the seven Contracts presently before this Court, the other 22 contracts contain provisions that specify where the arbitration is to take place – some select England as the forum for the arbitration while others select Massachusetts. As explained herein, the seven Contracts at issue do not contain a forum selection clause or otherwise specify where arbitration is to take place. In referring to the 29 putative contracts between the parties as "contracts" and in agreeing to submit to arbitration to resolve disputes arising out of those agreements, Sphere Drake does not agree that any of the "contracts" is valid or enforceable. As described in the Affidavit of Raymond Gordon Bell ("Bell Aff."), submitted with Sphere Drake's initial Motion to Dismiss or Stay, Sphere Drake's position is that the 29 Sphere Drake-Hancock contracts, including the seven Contracts before this Court, are void.

never agreed to or even seen by Sphere Drake or its agent. Indeed, the Contracts are evidenced solely by "slips,"[2] which were placed in London by London brokers with London underwriting agents purporting to bind a London insurance company. Not only did all of the relevant contract formation activity (such as it was) take place in London, all of the relevant witnesses to the contract formation reside in England.

While it is obvious that England is the appropriate situs for the arbitration to resolve the parties' disputes over the Contracts, it is also quite obvious why Hancock has gone to such lengths to attempt to have the arbitration take place outside England. As Hancock knows, all or virtually all of the witnesses to the fraud committed by Hancock's agent – a fraud that renders the Contracts void and unenforceable – reside in England and would thus be beyond the subpoena power of an arbitration panel sitting in Massachusetts. Because the appropriate situs for the arbitration is England, Sphere Drake has commenced arbitration proceedings in England over the same Contracts, and initiated an action in the English Commercial Court to compel Hancock to participate in the English arbitration.

Since Sphere Drake has agreed to arbitrate the dispute over the enforceability of the Contracts, the only issue before the Court is whether it should exercise its jurisdiction to resolve the issue of where the arbitration should be held. Hancock's representations notwithstanding, the Contracts evidence no agreement between the parties as to the proper situs of the arbitration. Yet under Section 4 of the Federal Arbitration Act ("FAA"), this Court can only order the parties to arbitrate in "the district in which the petition for an order directing such arbitration is filed" – that is, in Massachusetts. 9 U.S.C. § 4. As explained in detail herein, England is the only

---

[2]  A slip is an abbreviated form of reinsurance contract that "contains the commitment by the reinsurer(s) acknowledging the contract and summarizing its terms."   Eugene Wollan, Handbook of Reinsurance Law § 6.06(A) (2003 Supp.).

appropriate place for the arbitration to proceed. Accordingly, Sphere Drake respectfully requests that this Court, under the doctrine of international abstention, dismiss Hancock's Petition, or in the alternative, stay these proceedings pending the outcome of the English proceedings.

## BACKGROUND

### A.    The English Judgment

In January 1997, Sphere Drake entered into an agency agreement (the "Binding Authority") pursuant to which Sphere Drake granted authority to Euro International Underwriting Limited ("EIU") to underwrite certain types of reinsurance risks on Sphere Drake's behalf. (Bell Aff., ¶ 5.)  Over the course of eighteen months, EIU wrote 119 reinsurance contracts purportedly pursuant to the Binding Authority. (*Id.*, ¶ 7.)  London brokers Stirling Cooke Reinsurance Brokers Limited and Stirling Cooke Insurance Brokers Limited (collectively "Stirling Cooke" or "SCB"), acting on behalf of various insurers, including Hancock, placed 112 of these putative contracts with EIU. (*Id.*)

Sphere Drake subsequently discovered that Stirling Cooke and EIU had colluded to defraud Sphere Drake. (*Id.*, ¶¶ 6, 9.)  In 2000, Sphere Drake filed a lawsuit in the Commercial Court in England against EIU, Stirling Cooke, and the principals of those two entities (including Nick Brown and Jeff Butler, the directors of Stirling Cooke who placed the business at issue). (*Id.*, ¶ 9.)  In that action, Sphere Drake alleged that EIU and its principals John Whitcombe and Christopher Henton dishonestly breached the fiduciary duties they owed to Sphere Drake, that Stirling Cooke and its principals Brown and Butler dishonestly assisted in EIU's breach, and that Stirling Cooke (including Brown and Butler) and EIU (including Whitcombe and Henton) conspired to use unlawful means with the intention of injuring Sphere Drake.

3

In 2002, Justice Thomas (now Lord Justice Thomas, sitting on the Court of Appeal and the Senior Presiding Judge for England and Wales) heard the case during 110 trial days and, in July 2003, issued a lengthy and detailed judgment. (*Id.*, ¶¶ 9-10; *see also Sphere Drake Ins. Ltd. v. Euro Int'l Underwriting Ltd.,* Case No. 2000 Folio 249, 2003 WL 21729222 (Q.B. July 8, 2003) (the "Judgment").)[3]  Applying the criminal standard of proof to the allegations of dishonesty (Judgment, Part I at ¶ 107), Lord Justice Thomas found that the contracts Stirling Cooke placed with EIU under the Binding Authority – including the seven Contracts at issue in this action[4] – were accepted by EIU in dishonest breach of the fiduciary duties EIU owed to Sphere Drake.  Justice Thomas further found that Stirling Cooke knew that Sphere Drake had not authorized EIU to write the type of business at issue and that Stirling Cooke had dishonestly assisted EIU in its dishonest breach of the duties owed by it to Sphere Drake.  In particular, Lord Justice Thomas found, using the "beyond a reasonable doubt" standard of proof:

- "SD were not told that gross loss making business[5] would be written against reinsurers when they agreed to write the binder; *EIU knew that they were not authorized to write such business*" (Judgment Part I at ¶ 873 (emphasis added));

- "SCB were aware that SD did not know that SD had become participants in writing gross loss making business on the back of reinsurance; the placing of Programmes 2 and 3 with EIU and all subsequent placings were therefore effected by SCB when they knew that SD had not approved the writing of this type of business" (Judgment Part I at ¶ 1862(viii));

- "I am therefore sure that SCB dishonestly assisted EIU in the writing of all the business that was written by EIU for SCB and its clients, and that this was done from no later than 3 February 1997. . . .*[SCB] therefore knew, prior to the*

[3] The Judgment is submitted herewith as Exhibit 1.

[4] Using Hancock's shorthand, the Contracts at issue in this proceeding are the five layers of the "Specific Realm" Program (referred to as Programme 9 in the Judgment), the Quota Share Agreement (Programme 33), and the 95% Facility Quota Share Agreement (Programme 28).  In the English action and the Judgment, related contracts, i.e., different layers of coverage for the same business, were grouped together into "Programmes" (Bell Aff. , ¶ 7.)

[5] The phrase "gross loss making business" was used in the Judgment to denote "[b]usiness on which it was virtually inevitable, from the information presented, that the losses under the reinsurance would exceed the premium by a substantial margin." (Judgment Part I at ¶ 151.)

4

*confirmation of Programmes 1, 4 and 5,[6] that the business was being accepted by EIU without the authority of SD and that SD were ignorant of the true nature of the business"* (Judgment Part I at ¶ 888 (emphasis added)); and

- "I am sure that there was a collusive arrangement between SCB and EIU, the objective of which was to enable gross loss making business to be placed with SD; SCB's purpose was to find a source of reinsurance for their US business which they could ruthlessly exploit and earn commission. EIU's purpose was to earn commission." (Judgment Part I at ¶ 1865(i).)

In sum, Lord Justice Thomas found that EIU had no authority to write the business it accepted purportedly on Sphere Drake's behalf, and Stirling Cooke knew that EIU lacked authority to bind Sphere Drake. (*E.g.*, Judgment Part I at ¶ 1862(viii).)

Lord Justice Thomas also made specific findings about the business Stirling Cooke placed with EIU for Hancock, including the seven Contracts now in dispute. With respect to the Specific Realm Program (Program 9), Lord Justice Thomas found both that "EIU and in particular Mr. Henton acted dishonestly in accepting this programme" and that "Mr. Brown [of SCB] knew that Mr. Henton was acting in dishonest breach of duty and dishonestly assisted him in this." (Judgment Part II at ¶¶ 211-12.) Similarly, with regard to the 95% Facility Quota Share Agreement (Program 28), Lord Justice Thomas concluded that EIU "acted dishonestly in accepting this programme" and that "Butler [of SCB] knew that Mr. Henton was acting in dishonest breach of duty and dishonestly assisted him in this." (Judgment Part II at ¶¶ 654-55.) Finally with regard to the Quota Share Agreement (Program 33), Lord Justice Thomas found that "Mr. Henton acted dishonestly" in accepting the program, and that "Mr. Brown also acted dishonestly." (Judgment Part I at ¶¶ 1675-76.) Lord Justice Thomas also found that "SCB colluded with EIU" to cover up, *inter alia*, the lies SCB had told EIU about the Quota Share Agreement. (Judgment Part I at ¶¶ 1680-83.)

---

[6] EIU confirmed its acceptance of Programs 1 and 4 on February 12, 1997 and Program 5 on February 19, 1997. (Judgment Part I at ¶ 888.)

## B.    The Contracts

Hancock has represented to the Court that the five Specific Realm Contracts and the

Quota Share Agreement are all evidenced by three sets of documents:

> (a) a signed "slip" executed by Sphere Drake which identifies
> salient terms and conditions and summarizes the risks to be
> reinsured; (b) a "covernote" issued by the reinsurance intermediary
> to John Hancock advising of the reinsurance coverage effected
> with Sphere Drake; and (c) an unsigned wording which details the
> terms and conditions of the agreement in accordance with the slip
> and covernote.

(Amended Petition, ¶ 10.)  Similarly, Hancock has represented that the 95% Facility Quota Share

Agreement "is evidenced by a signed slip and a covernote," and claims that contractual wordings

from prior years of this program (years in which Sphere Drake did not participate) provide

further "evidence" of the parties' agreement.  (*Id.*, ¶¶ 19, 23-26.)

To the contrary, the seven slips are the *only* documents that purportedly "evidence" the

parties' agreement under these seven Contracts.  Stirling Cooke prepared the slips on behalf of

Hancock and the slips were executed by EIU, not Sphere Drake.  (Petitioner's Exs. 1(a), 2(a),

3(a), 4(a), 5(a), 6(a), 7(a).)  The covernotes were documents issued by Stirling Cooke as

Hancock's agent to Hancock's underwriting managers to advise the latter of the terms and

conditions of the reinsurance that Stirling Cooke purported to have placed with EIU.  (*See*

Amended Petition, ¶¶ 10, 19 and Petitioner's Exs. 1(b), 2(b), 3(b), 4(b), 5(b), 6(b), 7(b).)

Moreover, Hancock admits, as it must, that neither Sphere Drake nor its agent EIU ever signed

any of the full contract wordings submitted with Hancock's Petition as "evidence" of the parties'

agreements.  (*See* Amended Petition, ¶¶ 10, 23 and Petitioner's Exs. 1(c), 2(c), 3(c), 4(c), 5(c),

6(c), 8.)  Indeed, Hancock has pointed to nothing to establish that Sphere Drake or EIU *ever saw*

these contract wordings.  This is because they did not. (Bell Aff., ¶¶ 21-24, 28, 31, 55(1).)  The

slips themselves, therefore, are the only documentary evidence of the purported contractual agreements between the parties.

As for the slips themselves, none contains a choice of law provision or a forum selection clause, or even mentions the state of Massachusetts. (Petitioner's Exs. 1(a), 2(a), 3(a), 4(a), 5(a), 6(a), 7(a).) Rather, each merely includes the statement "Arbitration Clause" and either "Service of Suit Clause U.S.A." or simply "Service of Suit Clause." (*Id.*)

As explained more fully in the Bell Affidavit, Stirling Cooke offered and EIU, purportedly acting on Sphere Drake's behalf, accepted 22 other reinsurance contracts reinsuring Hancock. (Bell Aff., ¶¶ 32-45.) Unlike the slips for the seven Contracts at issue before this Court, each of the slips for the other 22 contracts specified where any arbitration would take place. (Bell Aff., ¶¶ 32, 34, 38, 42-44.) Pursuant to the terms of the slips, disputes arising out of the Hancock Per JEH Re Contracts (Program 1) and the JEH Re/Centaur Contract (Program 24) are to be resolved in arbitration in England, whereas disputes arising out of the Hancock/Hackett Contracts (Program 5), the Bridgefield Retrocession (Program 8), the Hancock/WEB VQS Contracts (Program 30), and the Hancock Direct Contracts (Program 12) are to be resolved in arbitration in Massachusetts. (*Id.*)

## C.    Proceedings Pending Between the Parties

Hancock has demanded arbitration in Massachusetts on the seven Contracts that contain no choice of law or forum and Sphere Drake has demanded arbitration in England on these same seven Contracts. (Bell Aff. Ex B Tab 18, pages 30-44.) By agreement, both parties' arbitration demands with regard to these Contracts were effective as of January 26, 2004. (*Id.*, Page 58.) On January 29, 2004, Sphere Drake filed applications in the English Commercial Court to compel Hancock to submit to arbitration over the seven Contracts in England. (Bell Aff., ¶ 63

and Ex. F.)  Like the Petition presently before this Court, Sphere Drake's applications to the

English Commercial Court seek a determination as to where the arbitration over the seven

Contracts should take place.  (Bell Aff. Ex. F.)[7]

As explained herein, the English Commercial Court should be permitted to make the

determination as to situs of the arbitration over the seven Contracts, as England is the only

appropriate place for the arbitration to be held, and in particular, because this Court would have

no discretion to order arbitration to proceed in England should it retain jurisdiction over

Hancock's Petition.  This Court should therefore abstain from exercising its jurisdiction over this

issue, and allow the English court to determine the situs of the arbitration.

## ARGUMENT

In the hopes of convincing this Court to compel Sphere Drake to arbitrate in

Massachusetts, Hancock attempts to place a domestic spin on the parties' dispute over the

enforceability of the Contracts.  (See. e.g., Memorandum in Support of Hancock's Verified

Amended Petition ("Hancock Mem."), pp. 9-10 ("[t]he Agreements are U.S. retrocessional

treaties ceding U.S. workers' compensation carve-out business . . . from John Hancock, a

Massachusetts corporation").)  However, the parties' dispute, which the parties agree will be

resolved in arbitration, centers principally on the issue of contract formation.  No matter where

the arbitration is conducted, Sphere Drake will maintain that none of the Contracts was validly

formed because, as Lord Justice Thomas held, Sphere Drake's agent EIU lacked authority to

bind Sphere Drake and Hancock's agent Stirling Cooke knew EIU lacked authority.[8]

---

[7] A hearing on Sphere Drake's claim form has been set for March 12, 2004.

[8] As the Second Circuit Court of Appeals recognized in a case concerning contracts Stirling Cooke placed with EIU for a different cedent, "if an agent that has been charged with negotiating a contract on behalf of the principal acts outside the scope of its agency, *and the opposing party knows this,* then the agent lacks both actual and apparent authority, and the principal is not bound to the contract, for the contract is void--it never came into legal existence." *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001) (emphasis in original).

England is the only appropriate place to resolve the parties' current dispute. The negotiation and fraudulent placement of the Contracts took place in England between Stirling Cooke and EIU, both English companies. As Hancock is no doubt aware, going forward with a Massachusetts forum for the arbitration proceedings will likely preclude the parties from obtaining live testimony from any of the witnesses with personal knowledge concerning the negotiation, placement, and purported formation of the Contracts should an evidentiary hearing be required. The significance of the situs of the arbitration is thus far greater than simply a matter of convenience to the parties. Since this Court would have no discretion under the FAA to order the arbitration to proceed in England, Sphere Drake requests that this Court abstain from exercising its jurisdiction to allow the English court to determine the situs of the arbitration.

## I.    Neither the Full Contract Wordings Nor Covernotes Provides Any Evidence As to What the Parties Agreed.

Defying the most basic concepts of contract law, Hancock seeks to rely on documentation, neither signed nor seen by EIU or Sphere Drake, as "evidence" of Sphere Drake's contractual intent. Indeed, Hancock quotes at length from provisions in contract wordings that Sphere Drake had no say in drafting, that were not negotiated between the parties, that Sphere Drake and its agent never signed, and that were never even forwarded to Sphere Drake or EIU. Contractual intent cannot be derived from a document that one of the parties never saw or even knew existed. Moreover, the fact that previous reinsurers of the 95% Facility Quota Share Program[9] may have agreed to arbitrate in Massachusetts provides no evidence that *Sphere Drake* would have agreed to do so. *See Czarina, LLC v. W.F. Poe Syndicate*, 254 F.

---

[9]  SCB's first involvement in placing the 95% Facility Quota Share was in 1998. Hancock placed the prior years of the 95% Facility Quota Share and a portion of the 1998 Quota Share through a different broker, D.W. Van Dyke. (Judgment Part II at ¶¶ 607-611.) Indeed, in contrast to their current position, in the English action before Justice Thomas, Hancock questioned the relevance of the 1998 Van Dyke slip and wording to SCB's placement of the 1998 Facility Quota Share with EIU. (Judgment Part II at ¶ 636(iv)-(v).)

Supp. 2d 1229, 1237 (M.D. Fla. 2002) (concluding evidence failed to establish that quota share reinsurer would have accepted arbitration clause contained in wording for prior years on which reinsurer did not participate). Moreover, as the *Czarina* court explained, "variation among participants' contracts respecting . . . venue for dispute resolution erects no impediment to the efficiency or efficacy of a quota share arrangement." *Id.* at 1235 n.12. Thus, Hancock's contention that arbitration must occur in Massachusetts because the parties "understood the need for consistency of terms and conditions governing the Facility Quota Share Program" is unfounded. (Hancock Mem., p. 8.) Hancock's reliance on contract wordings is wholly inappropriate and the Court should ignore these wordings in reviewing the issue before it.

Hancock's separate reliance on the covernotes, which were forwarded to Hancock's underwriting managers, not Sphere Drake,[10] is similarly misplaced. It is well settled that a covernote itself is not a contract, but is merely a confirmation by the broker to his principal of the coverage that has been placed. *See* Eugene Wollan, Handbook of Reinsurance Law § 6.06(A) (2003 Supp.) ("Both [the Placing Slip and the Cover Note] summarize the terms of the placement; indeed, they frequently look very much alike, and they contain essentially the same coverage information. The reinsurer, however, is a party to, and is bound by, only the Placing Slip.") Here, the fact that *Hancock* received copies of the covernotes from its agent Stirling Cooke has no bearing on what Sphere Drake's intentions were.

Hancock spends the majority of its argument citing authority for the unremarkable proposition that, under the FAA, doubts or ambiguities concerning agreements to arbitrate should be resolved in favor of arbitration. (Hancock Mem., pp. 11-14.) However, both parties have already agreed to submit their disputes over the seven Contracts to arbitration. The issue is

---

[10] Each of the covernotes is directed to JEH Re Underwriting Management Bermuda Ltd or James E. Hackett Reinsurance Corporation, Hancock's underwriting agents. (Petitioner's Exs. 1(b), 2(b), 3(b), 4(b), 5(b), 6(b), 7(b).)

*where* the disputes should be arbitrated.  Hancock bases its argument on the faulty premise that "Sphere Drake has refused to proceed with arbitration *as required by the contractual documentation of the Agreements.*" (*Id.* at 11 (emphasis added).)  This is factually wrong.  Moreover, as the Supreme Court has recognized, "the federal policy [favoring arbitration] is simply to ensure the enforceability, *according to their terms*, of private agreements to arbitrate." *Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989) (emphasis added).  Here, Hancock asks the Court to enforce terms that were never agreed to by Sphere Drake.  The federal policy favoring arbitration cannot be deemed to go so far as to bind a party to terms that it never negotiated, never saw, and never knew might be proposed.  To the extent the Court deems contractual intention relevant, the Court should rely exclusively on the signed placement slips, the only documents actually evidencing the Contracts.

## II.    Nothing in the Slips Requires the Arbitration to Take Place in Massachusetts.

When documentation before the Court is properly limited to the reinsurance slips themselves, Hancock has no evidence supporting its contention that Massachusetts is the appropriate forum for arbitrating disputes arising out of the Contracts.  Rather, in stark contrast to the situation as represented by Hancock, the truth is that none of the slip clauses cited by Hancock requires or even suggests that the arbitration must or should be held in Massachusetts.

Hancock relies primarily on references to "Service of Suit Clause – U.S.A." in the slips for the Realm Agreements and the Quota Share Agreement[11] in support of its contention that the arbitration must take place in Massachusetts.  (Hancock Mem., pp. 5-6.)  Hancock's position appears to be that the service of suit provisions in the slips operate as a mandatory forum

---

[11] The slip for the 95% Facility Quota Share Agreement also refers to a service of suit clause, but does not specify a location.  (Petitioner's Ex. 7(a).)  Thus, the inclusion of a service of suit clause in the slip for this risk provides no insight whatsoever as to the parties' choice of the situs of the arbitration.

selection clause requiring Sphere Drake to arbitrate in the United States (and specifically, in Massachusetts). The law is to the contrary.

A "service of suit clause is intended to be used to enforce an arbitration award," *Credit General Ins. Co. v. John Hancock Mut. Life Ins. Co.*, No. 1:99CV02698 (N.D. Ohio 2000) (adopting Hancock's position in that case),[12] not to provide an exclusive forum selection. Thus, courts consistently hold that the existence of a service of suit provision in a contract does not preclude a party from initiating or transferring a proceeding to another jurisdiction. In *W.R. Grace & Co. v. Hartford Accident & Indemnity Co.*, 407 Mass. 572, 580 (1990), for example, the Massachusetts Supreme Judicial Court considered this identical issue, and concluded that "a service of suit clause does not lock an insurance company into the jurisdiction selected by its insured nor does such a provision bar a court in that jurisdiction from considering a plea of forum non conveniens." Notwithstanding the service of suit clause in the contract and the fact that the underwriters had selected Massachusetts as the appropriate place for service, the court in *W.R. Grace* concluded "New York is the logical State in which to resolve the dispute," and therefore affirmed dismissal of the Massachusetts case on *forum non conveniens* grounds. *Id.* at 575, 581-82.

Other courts have adopted the same approach, holding that a service of suit provision is not a mandatory forum selection clause. *See, e.g., Friar v. TL Dallas (Special Risks) Ltd.*, No. H-02-0030, 2003 WL 22095664, at *4-*5 & n.3 (S.D. Tex. Jan. 27, 2003); *Whirlpool Corp. v. Certain Underwriters at Lloyd's London*, 278 Ill. App. 3d 175, 180 (Ill. App. Ct. 1996); *Price v. Brown Group Inc.*, 206 A.D.2d 195, 199 (N.Y. App. Div. 1994). And, the same reasoning applies where the defendant insurer seeks to submit the dispute to a foreign tribunal. *See Brooke*

---

[12] A copy of the Memorandum & Order in that case is attached hereto as Exhibit 2.

*Group Ltd. v. JCH Syndicate*, 87 N.Y.2d 530, 532-34 (N.Y. 1996) (holding that service of suit clause "does not bind the parties to litigate in a particular forum, or give the insured the exclusive right to choose a forum unrelated to the dispute," and affirming trial court's dismissal of the action on forum *non conveniens* grounds in favor of arbitration pending in England).

In this case, the wording in the slips – "Service of Suit Clause U.S.A." – is not a mandatory forum selection clause and does not preclude Sphere Drake from demanding arbitration in England or from initiating proceedings in England to compel arbitration in England.

**III.    Hancock's Contentions Regarding "Course of Dealing" Are Wholly Unsupported.**

Hancock also argues that a course of dealing exists that demonstrates that the Contracts are subject to Massachusetts law and jurisdiction. Hancock is wrong. The slip for each of the contracts where Sphere Drake is not contesting arbitration in the United States specifically provides for arbitration under Massachusetts law and under the jurisdiction of the courts of Massachusetts. (Bell Aff. Exs. C, D, E.)  Similarly, the slips for each of the contracts where Hancock is not contesting arbitration in England expressly provide for arbitration under the laws and jurisdiction of England.  (Bell Aff. Ex. B Tabs 13, 16.)  The fact that there is no reference to a choice of law or venue in the seven slips in dispute means that there was no agreement on that issue, not that Sphere Drake thereby agreed to arbitrate in whatever jurisdiction Hancock today prefers.

Recognizing the weakness of its argument on course of dealing, Hancock next attempts to distinguish the contracts by the types of business reinsured, arguing that the contracts that provide for arbitration in England reinsure LMX or other London market business, or the underlying business itself is expressly governed by English law, whereas those contracts that are to be arbitrated in the U.S. reinsure domestic U.S. business. (Amended Petition, ¶¶ 30-31.)  This

13

supposed division based on type of business is false. Indeed, Hancock has ceded LMX business to both the Facility Quota Share and the Quota Share Agreements. (E.g., Judgment Part I at ¶ 1552, Part II at ¶ 639(iii).) Moreover, the Quota Share Agreement was explicitly intended to replace the Hancock Per JEH Re Program (Program 1), which was subject to arbitration in England. (Bell Aff., ¶¶ 29, 34.) Hancock itself identifies the Quota Share Agreement as the "BE LMX Quota Share Agreement," (Amended Petition, ¶ 9(f)), while the slip explicitly provides for the cession of "Personal Accident London Market Excess of Loss Reinsurance" written by Hancock. (Petitioner's Ex. 6(a).) And, the JEH Re Centaur Contract (Program 24), which Hancock concedes is subject to arbitration in England (Bell Aff. Ex. 18 at p. 59), reinsures business written in the United States. (Judgment Part II at ¶ 733.) Hancock's supposed course of dealings argument is predicated on false assumptions and must therefore be rejected.

IV.    **The Court Should Dismiss or Stay This Action Pending the Outcome of the English Proceedings Under the Doctrine of International Abstention.**

Because nothing in the Contracts requires the arbitration to take place in Massachusetts, the Court may abstain from exercising its jurisdiction over this matter, and dismiss or stay this Petition in favor of the proceedings pending in England. In this case, abstention is particularly appropriate, as only the English court can compel the parties to arbitrate in England,[13] and England, where all the key witnesses reside, is clearly the appropriate situs for the arbitration.

The Court of Appeals for the First Circuit has recognized that the "'power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Hewlett-Packard Co. v. Berg*, 61 F.3d 101, 105 (1st Cir. 1995) (quoting *Landis v. N. Am. Co.*,

---

[13] To compel arbitration in England, the English court must first determine that the seat of the arbitration is in England "having regard to the parties ' agreement and all the relevant circumstances. Supplemental Affidavit of Raymond Gordon Bell ("Supp. Bell Aff.") ¶ 5 (submitted as Exhibit 3 hereto).

14

299 U.S. 248, 254 (1936)). At least one court in this District has squarely addressed the issue of abstention in the international context.

In *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248 (D. Mass. 1999), the court considered a motion to stay or dismiss a Massachusetts District Court action where a similar action was pending in England. *Id.* at 249-50. Dunkin' Donuts brought the original action in England against DD UK. A year later, DD UK and its director and majority shareholder Robert F. Goldhammer filed their own action in federal court in Massachusetts. Dunkin' Donuts responded with a motion to dismiss or stay the Massachusetts action on "international abstention grounds because both actions share overlapping legal and factual issues." *Id.* at 250. The court began its analysis by noting that "[f]ederal courts have the inherent power to stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *Id.* at 251.

The *Goldhammer* court then set forth the

> roster of relevant factors [trial courts have developed] in
> determining whether to grant a stay because of parallel litigation in
> a foreign forum: (1) similarity of parties and issues involved in the
> foreign litigation; (2) the promotion of judicial efficiency;
> (3) adequacy of relief available in the alternative forum; (4) issues
> of fairness to and convenience of the parties, counsel, and
> witnesses; (5) the possibility of prejudice to any of the parties; and
> (6) the temporal sequence of the filing of the actions.

*Id.* at 252-53 (citations omitted). The court applied these factors to the facts before it, and concluded that the "ledger of the factors that guide the Court's discretion in determining whether to proceed in light of the English action leads to a stay in this action." *Id.* at 255; *see also Hewlett-Packard*, 61 F.3d at 105-06 (staying action to confirm arbitration award for "prudential reasons" until second arbitration was concluded).

Other federal courts have adopted the approach the court used in *Goldhammer* to determine whether to dismiss or stay an action in favor of a pending foreign proceeding on

international abstention grounds. *See, e.g., MLC (Bermuda) Ltd. v. Credit Suisse First Boston Corp.*, 46 F. Supp. 2d 249, 251 (S.D.N.Y. 1999) (dismissing federal court action in favor of action proceeding in England); *Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 954 F. Supp. 101, 103 (S.D.N.Y. 1997) (staying federal court action in favor of action proceeding in Belgium); *see also Finova Cap. Corp. v. Ryan Helicopters U.S.A. Inc.*, 180 F.3d 896, 898 (7th Cir. 1999) (affirming district court's stay in favor of an action pending in court in St. Lucia). In this case, it is clear that dismissal or a stay on international abstention grounds is warranted to enable the English court to decide the issue of arbitration situs.

The *Goldhammer* factors clearly favor abstention. The parties to this action are *identical* to the parties to the pending arbitration in England, and to the action Sphere Drake initiated in England to compel Hancock to submit to the English arbitration panel's jurisdiction.[14] Moreover, the factual and legal issues to be decided in each case are the same. Both this Court and the English Commercial Court have been called upon to decide, based on identical facts, which forum is the appropriate situs for arbitration. *See, e.g., Credit Suisse,* 46 F. Supp. 2d at 252 (dismissing under international abstention doctrine where, *inter alia,* there was "a substantial identity of issues between the two lawsuits [and] [b]oth cases [arose] from the same set of transactions, and the essential controversies [were] squarely before the British court"). The English Commercial Court is fully competent to grant the relief each party is seeking – a ruling on where the arbitration should be tried. *See Credit Suisse,* 46 F. Supp. 2d at 253 ("The competence of British courts to adjudicate commercial disputes is beyond question."). Nor does Hancock have any colorable argument that a resulting arbitration in England would be

---

[14] The temporal sequence of the lawsuits should play no role in the analysis, since neither this action nor the proceedings Sphere Drake initiated in England has progressed beyond the initial filing stage. *See, e.g., Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 820 (1976) (finding significant, in holding that abstention was proper, "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss").

16

inadequate as Hancock has expressly agreed to arbitrate disputes concerning several other reinsurance contracts with Sphere Drake in England. (Bell Aff. ¶¶ 34, 38 and Ex. B Tabs 13, 16.) Judicial economy will also be promoted by having the English court – the only court with authority to order arbitration in either forum[15] – decide the location of the arbitration. *See, e.g., Goldhammer*, 59 F. Supp. 2d at 254 ("Allowing this case to go forward in tandem with the English case would consume a great amount of judicial, administrative, and party resources.") (citations and quotation marks omitted).

England is the only sensible situs for the arbitration, as well as for any litigation over the proper situs for the arbitration. The only witnesses who participated in placing and accepting the Contracts – Whitcombe, Henton, Butler, and Brown – are located in England, as are Sphere Drake[16], EIU and Stirling Cooke, the relevant entities. (Bell Aff., ¶ 64.) A Massachusetts arbitration panel will be unable to compel any of the key witnesses to testify in Massachusetts. *See, e.g., Legion Ins. Co. v. John Hancock Ins. Co.*, No. MISC. 01-162, 2001 WL 1159852, at *1 (E.D. Pa. Sept. 5, 2001), *aff'd* 33 Fed. Appx. 26, 2002 WL 537652 (3d Cir. April 11, 2002) (holding that district court in Pennsylvania lacked authority to enforce subpoena issued by arbitration panel sitting in Pennsylvania to non-witness in Florida). Indeed, a Massachusetts arbitration would likely foreclose the parties from presenting live testimony from any of the witnesses with information concerning the fraud perpetrated by Hancock's agent, Stirling Cooke, in placing the Contracts. *See Evergreen*, 954 F. Supp. at 104 (staying action where, *inter alia*, "[w]itnesses and evidence related to this issue will be located in Belgium").

---

[15] Where (as here) the parties have not designated the seat of the arbitration, the English Commercial Court presiding over Sphere Drake's pending claim has the power to determine the seat of the arbitration "having regard to the parties' agreement and all the relevant circumstances." (Supp. Bell Aff. at ¶ 3.)

[16] Sphere Drake has learned that Hancock's English solicitors have contacted former employees of Sphere Drake in England, seeking to interview them.

Aside from the fact that Hancock would apparently prefer a domestic forum, moving forward with the English proceedings will not cause Hancock any undue prejudice.[17] The same cannot be said if this Court retains jurisdiction over the situs issue. Under Section 4 of the FAA, the only place this Court can order the parties to arbitrate is within this District. 9 U.S.C. § 4; *see also, e.g., Dempsey v. George S. May Int'l Co.*, 933 F. Supp. 72, 75-76 (D. Mass. 1996) (holding that a "federal court may only order arbitration in the district in which it sits," and transferring action to Northern District of Illinois since contract provided for arbitration in Illinois). Accordingly, should this court retain jurisdiction, the situs issue would be resolved by default in favor of a Massachusetts arbitration. Forcing the parties to arbitrate in Massachusetts would prejudice the parties, since the principals of EIU and Stirling Cooke, the key witnesses with respect to the Contracts, could not be compelled to testify in a Massachusetts arbitration proceeding.

## V.    The Federal Arbitration Act Does Not Prevent This Court From Abstaining.

In certain circumstances, federal courts have decided not to abstain from exercising their jurisdiction to resolve motions to compel arbitration under the FAA. *See Cashman Equip. Corp. v. Kimmins Contracting Corp.*, No. 03-10463, 2004 WL 32961, at *7 (D. Mass. Jan. 5, 2004) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1 (1983)). However, in this case, abstention is appropriate notwithstanding the fact that Hancock seeks to compel arbitration. Neither *Cashman* nor *Moses Cone* addresses the issue of whether a court should abstain in favor of an action pending in a foreign jurisdiction, but rather considered abstention in favor of another action pending in a state court. *See Cashman*, 2004 WL 32961, at *1-*2; *Moses*

---

[17] *See* Supp. Bell Aff. ¶¶6-10 and Exhibit A thereto for a description of English arbitration procedures and the bases upon which arbitral awards can be challenged in England. Hancock does not appear to be challenging the fairness of the English courts. Such a challenge would be without merit. *See, e.g., WIWA v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir. 2000) ("[w]e regard the British courts as exemplary in their fairness and commitment to the rule of law").

*Cone*, 460 U.S. at *7; *see also Paul Revere Variable Annuity Ins. Co. v. Thomas*, 66 F. Supp. 2d

217, 220-23 (D. Mass. 1999). As the Supreme Court explained, one of the

> important reason[s] against allowing a stay is the probable
> inadequacy of the state-court proceeding to protect Mercury's
> rights. . . . [I]t suffices to say that there was, at a minimum,
> substantial room for doubt that Mercury could obtain from the state
> court an order compelling the Hospital to arbitrate.

*Moses Cone*, 460 U.S. at 26-27. Of course, the concern expressed by the Court in *Moses Cone* is

not implicated in this case, as there is no doubt that the English court is competent to determine

the issue of the appropriate situs for the arbitration. Accordingly, this Court is not precluded

from exercising its discretion to dismiss or stay this action in favor of the pending English

proceedings.

  While few courts have considered the interplay between the FAA and abstention in the

international context, those that have analyzed the issue have concluded that the FAA does not

preclude international abstention. In *Pepsico Inc. v. Oficina Central de Asesoria Y Auday*

*Tecnica, C.A.*, 945 F. Supp. 69, 70-71 (S.D.N.Y. 1996) petitioners moved to compel arbitration

and respondents, while conceding that the court had jurisdiction and the power to compel

arbitration, "ask[ed] the Court to decline jurisdiction as a matter of international comity" in favor

of a proceeding pending in Venezuela. The court held that abstention was appropriate under the

circumstances to enable the Venezuelan court to determine a threshold issue that was subject to

Venezuelan law. *Id.* at 71. In *Stock West, Inc. v. Confederated Tribes of the Colville*

*Reservation*, 873 F.2d 1221, 1222-24 (9th Cir. 1989) the issue was whether the district court

properly abstained from deciding a motion to compel arbitration where an action on the same

contract was pending in a tribal court. The Court of Appeals affirmed the district court's ruling,

holding that it "was proper for the district court to defer [to the Tribal Court] on the grounds of

comity." *Id.* at 1230; *see also CNA Reinsurance Co. v. Trustmark Ins. Co.*, No. 01 C 1652, 2001

WL 648948, at *7 (N.D. Ill. June 5, 2001) (dismissing petition to compel arbitration on forum non conveniens grounds because, among other reasons, English court had access to witnesses to issue of whether location for arbitration had been agreed).

The courts' decisions in *Pepsico* and *Stock West* establish that abstention is appropriate in the international context even where abstention would involve a court's decision not to resolve a motion to compel arbitration. This conclusion is further supported by cases outside the international context that have held that courts can abstain or stay proceedings in the face of a motion to compel arbitration in a variety of instances. *See, e.g., Hewlett-Packard*, 61 F.3d at 105-06 (*supra* at 15); *Doughty v. Underwriters at Lloyd's, London*, 812 F. Supp. 13, 13-15 (D. Mass. 1993) (abstaining from exercising jurisdiction over motion to compel arbitration and remanding case to state court); *Cigna Healthcare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 851-55 (7th Cir. 2002) (affirming district court's abstention of exercise of jurisdiction over motion to compel arbitration in favor of pending parallel state court proceeding). Thus, *Moses Cone* notwithstanding, it is clear that abstention is appropriate where circumstances warrant its application, even in the face of a motion to compel arbitration.

### Conclusion

For the foregoing reasons, Respondent Sphere Drake respectfully requests that this Court abstain from exercising its jurisdiction over the Verified Amended Petition and either dismiss the Petition or stay it pending the outcome of the English proceedings.

SPHERE DRAKE INSURANCE LIMITED
By its attorneys,


Andrea Peraner-Sweet (BBO#550515)
Heather V. Baer (BBO#566746)
SALLY & FITCH
225 Franklin Street
Boston, MA 02110
(617) 542-5542

OF COUNSEL:
Harold C. Wheeler (Attorney I.D. No. 2996960)
Teresa Snider (Attorney I.D. No. 06210115)
Kevin J. O'Brien (Attorney I.D. No. 06193882)
Mark A. Schwartz (Attorney I.D. No. (6270580)
Butler, Rubin, Saltarelli & Boyd LLP
3 First National Plaza
70 West Madison Street, Suite 1800
Chicago, Illinois 60602
(312) 444-9660


## CERTIFICATE OF SERVICE

I, Andrea Peraner-Sweet, hereby certify that a copy of this document was served upon all counsel of record by hand on February 11, 2004.


Andrea Peraner-Sweet


W:\S\Sphere\Hancock\Pleadings\mem support dismiss amended petition final.doc

21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*2*

-----------------------------------------------------------------

In the Matter of the Arbitration Proceedings Between

JOHN HANCOCK LIFE INSURANCE COMPANY,
      Petitioner,

And

SPHERE DRAKE INSURANCE LIMITED,
      Respondent.

Civil Action No. 04 10181
MLW

-----------------------------------------------------------------

## SUPPLEMENTAL AFFIDAVIT OF
## RAYMOND GORDON BELL

Raymond Gordon Bell, being duly sworn, deposes and says:

1.    I am a partner of Clyde & Co., a firm of solicitors based in London, and serve as counsel to Sphere Drake Insurance Limited (Sphere Drake). I have been asked to describe the English Arbitration Act 1996, a true and accurate copy of which is attached hereto as Exhibit A. This copy is produced by Butterworths, one of the main legal publishers in England. The notes under each Section of the Act are by Butterworths and are not part of the Act itself.

2.    I qualified as a Solicitor of the Supreme Court in 1984 and have some 15 years experience of English commercial arbitrations. My experience includes the Arbitration Act 1996 since it came into force.

3.   The Arbitration Act 1996 was the fruition of years of consideration and consultation by the Department of Trade and Industry's Departmental Advisory Committee (DAC) on Arbitration Law. The DAC was chaired successively by Lord Mustill, Lord Steyn and Lord Justice (now Lord) Saville, three Law Lords all of whom were former Commercial Court Judges and experienced in commercial arbitrations in London. The Act represented a thorough overhaul and modernisation of English Arbitration law and procedure.

4.   The bulk of the Arbitration Act 1996 came into force on 31st January 1997 pursuant to a statutory instrument and applies to arbitrations commenced (and to arbitration applications made) after that date. The 1996 Act is divided into four parts. Part I, containing sections 1 to 84 and entitled "Arbitration Pursuant to an Arbitration Agreement," codifies English arbitration law. Part II, containing sections 85 to 98 and entitled "Other Provisions Relating to Arbitration," contains provisions relating to domestic arbitration agreements, consumer arbitration agreements, small claims arbitration, statutory arbitrations, and the appointment of judges as arbitrators. Part III containing sections 85 to 98, is entitled "Recognition and Enforcement of Certain Foreign Awards" and provides for enforcement of awards under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the New York Convention), to which the United States and England are signatories, and enforcement of awards under the Geneva Convention. Part IV of the Arbitration Act contains miscellaneous provisions in sections 104 to 110 and is entitled "General Provisions."

5.   The provisions of Part I of the Arbitration Act apply where the seat of the arbitration is in England (Section 2(1)). Where the parties have not designated the seat of the arbitration or conferred the power to so designate on the arbitral tribunal or some other arbitral institution, the seat will be determined "having regard to the parties' agreement and all the relevant circumstances". (Section 3). If the Court is asked to exercise any the powers conferred on it by Part I on the basis that the seat of the arbitration is in England, then the Court must necessarily first determine where the seat of the arbitration is.

6.   The Arbitration Act provides in Part I that the parties are free to agree on the number of arbitrators and the procedure for their appointment. (Sections 15 and 16) If there is no

agreement on the number of arbitrators, the arbitral tribunal shall consist of a sole arbitrator.   (Section 15(3))   The court has the power to give directions for the appointment of, or itself appoint, the sole arbitrator if the parties fail to agree on appointment. (Section 18)

7.    The arbitral tribunal is required to "act fairly and impartially as between the parties, giving each party a reasonable opportunity of putting his case and dealing with that of his opponent," and to "adopt procedures suitable to the circumstances of the particular case, avoiding unnecessary delay or expense, so as to provide a fair means for the resolution of the matters falling to be determined." (Section 33)

8.    The parties are free to agree on the form of the award and, to the extent they have not done so, the award must be in writing and signed by the arbitrators.  The award must also contain the reasons for the award, unless the parties have agreed to dispense with having a reasoned award issued. (Section 52)

9.    A party may challenge an award under three separate provisions in Part I of the Arbitration Act 1996: Section 67 allows challenges on the basis of a lack of substantive jurisdiction by the tribunal, Section 68 allows challenges on the basis of a serious irregularity affecting the tribunal, the proceedings or the award and Section 69 provides for an appeal on a question of law.  The Act defines a "serious irregularity" as one which the court considers "has caused or will cause substantial injustice to the applicant" and which falls into one of the following categories:

> (a) failure by the tribunal to comply with section 33 (general duty of tribunal)
>
> (b) the tribunal exceeding its powers (otherwise than by exceeding its substantive jurisdiction; see section 67)
>
> (c)    failure by the tribunal to conduct the proceedings in accordance with the procedure agreed by the parties;

(d) failure by the tribunal to deal with all the issues that were put to it;

(e) any arbitral or other institution or person vested by the parties with powers in relation to the proceedings or the award exceeding its powers;

(f) uncertainty or ambiguity as to the effect of the award;

(g) the award being obtained by fraud or the way in which it was procured being contrary to public policy;

(h) failure to comply with the requirements as to the form of the award;

(i) any irregularity in the conduct of the proceedings or in the award which is admitted by the tribunal or by any arbitral or other institution or person vested by the parties with powers in relation to the proceedings or the award.

If such a serious irregularity is shown, the court may remit the award to the tribunal for reconsideration, in whole or in part, set the award aside in whole or in part or declare the award to be of no effect, in whole or in part.  (Section 68)  With regard to Section 69 and appeals on a point of law, if the parties agree to dispense with reasons for the award, such an agreement will be considered an agreement to exclude the court's jurisdiction under section 69. (Section 69)

10.   A New York Convention Award will be recognised and enforced except in the cases set out under Section 103 of the Arbitration Act 1996.  The grounds listed in Section 103 closely follow those contained in Article V of the New York Convention.

11.   I confirm that the contents of this affidavit are true to the best of my knowledge and belief.

GFDLIT 507882.1                          4

I make this affidavit on 10th February 2004.

.................................

Raymond Gordon Bell


Sworn on 10th February 2004 at

55 Quarry Street Guildford GU1 3UY
in the County of Surrey England

Before me,

.................................

Notary Public



ANDREW M. JACKSON
NOTARY PUBLIC

Guildford

My Commission expires with life

Ro: 497. 8. D 3347

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS



-----------------------------------------------------------

In the Matter of the Arbitration Proceedings Between

JOHN HANCOCK LIFE INSURANCE COMPANY,
    Petitioner,

        And

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

-----------------------------------------------------------

Civil Action No. 04 10181
MLW

This is the exhibit marked "A" and referred to in the Supplemental Affidavit of

RAYMOND GORDON BELL sworn before me this 10th day of February

2004.

...ore me ................

**Notary Public**

ANDREW M. JACKSON
NOTARY PUBLIC

Guildford

Fo. 497 : 8 - 7336

GFDLIT 507853.1

10/02/2004 at 13:35 - content provided by the Butterworths Direct Online Service
*All rights reserved. No part of this text may be photocopied or otherwise reproduced*
*without the written permission of Butterworths.*



---

**Legislation Direct, UK Statutes, Arbitration Act 1996 (1996 c 23)**

---

# Arbitration Act 1996

### 1996 CHAPTER 23

*An Act to restate and improve the law relating to arbitration pursuant to an arbitration*
*agreement; to make other provision relating to arbitration and arbitration awards; and for*
*connected purposes*

[17th June 1996]

BE IT ENACTED by the Queen's most Excellent Majesty, by and with the advice and
consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament
assembled, and by the authority of the same, as follows:—

Part I
Arbitration Pursuant to an Arbitration Agreement

---

*Introductory*

## 1 General principles

The provisions of this Part are founded on the following principles, and shall be construed
accordingly—

    (a)    the object of arbitration is to obtain the fair resolution of disputes by an
impartial tribunal without unnecessary delay or expense;

    (b)    the parties should be free to agree how their disputes are resolved,
subject only to such safeguards as are necessary in the public interest;

    (c)    in matters governed by this Part the court should not intervene except as
provided by this Part.

**NOTES**

**Initial Commencement**

    ***To be appointed***

To be appointed: see s 109(1).

**Appointment**

Appointment: 31 January 1997: see SI 1996/3146, art 3; for transitional provisions see art 4, Sch 2 thereto.

**Extent**

This section does not extend to Scotland: see s 108(1).

### 2 Scope of application of provisions

(1)   The provisions of this Part apply where the seat of the arbitration is in England and Wales or Northern Ireland.

(2)   The following sections apply even if the seat of the arbitration is outside England and Wales or Northern Ireland or no seat has been designated or determined—

> (a)    sections 9 to 11 (stay of legal proceedings, &c), and

> (b)    section 66 (enforcement of arbitral awards).

(3)   The powers conferred by the following sections apply even if the seat of the arbitration is outside England and Wales or Northern Ireland or no seat has been designated or determined—

> (a)    section 43 (securing the attendance of witnesses), and

> (b)    section 44 (court powers exercisable in support of arbitral proceedings);

but the court may refuse to exercise any such power if, in the opinion of the court, the fact that the seat of the arbitration is outside England and Wales or Northern Ireland, or that when designated or determined the seat is likely to be outside England and Wales or Northern Ireland, makes it inappropriate to do so.

(4)   The court may exercise a power conferred by any provision of this Part not mentioned in subsection (2) or (3) for the purpose of supporting the arbitral process where—

> (a)    no seat of the arbitration has been designated or determined, and

> (b)    by reason of a connection with England and Wales or Northern Ireland the court is satisfied that it is appropriate to do so.

(5)   Section 7 (separability of arbitration agreement) and section 8 (death of a party) apply where the law applicable to the arbitration agreement is the law of England and Wales or Northern Ireland even if the seat of the arbitration is outside England and Wales or Northern Ireland or has not been designated or determined.