UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

In the Matter of the Arbitration Proceedings between

JOHN HANCOCK LIFE
INSURANCE COMPANY,
    Petitioner,

and

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

Civil Action No.
04-10181MLW

---

## AFFIDAVIT OF MALCOLM J. BEACHAM IN SUPPORT OF JOHN HANCOCK'S MOTION FOR SUMMARY JUDGMENT

I, Malcolm J. Beacham, depose and state the following:

1. I have been employed in the London market insurance industry for over thirty-four years. During that time, I spent over twenty-nine years as a Lloyd's underwriter.

2. My curriculum vitae is attached as Exhibit 1 hereto.

3. For over eleven years, I served as a Director of the following Lloyd's managing agencies: Hiscox Syndicates Ltd., Payne Hiscox Ltd. and RGB Underwriting Agencies Ltd. As Director of these Lloyd's managing agencies, I was responsible for syndicate management.

4. From 1968-1977, I was an accident underwriter at C.E. Heath & Co. (Underwriting) Ltd. While at C.E. Heath & Co., I was responsible for underwriting a book of accident business.

1

5. From 1977-1995, I held various underwriting positions within the Hiscox Group. In my position as Active Underwriter, I was responsible for underwriting oversight for all direct and reinsurance business written by certain Hiscox syndicates.

6. From 1996-1999, I was the head of the Liability Department at RGB Underwriting Agencies Ltd. and was responsible for both underwriting and underwriting oversight for professional indemnity and liability treaty reinsurance accounts.

7. Since 1999, I have been an independent consultant providing services primarily to Lloyd's syndicates, London brokers and insurance/reinsurance companies in the London insurance market. Those services include underwriting strategy and business risk reviews on direct and reinsurance programs.

8. Throughout my career in the London insurance market, I have underwritten thousands of insurance and reinsurance contracts covering various sectors of London insurance market business including, direct insurance (including personal accident, professional indemnity, property fire & perils, and other business); treaty reinsurance (including personal accident, workers' compensation, property, international liability, medical expenses, and motor business); and London Market Excess of Loss reinsurance (including personal accident, property and liability business).

9. The opinions stated in this affidavit are based on my knowledge, experience and training with respect to underwriting London insurance market direct and reinsurance business, as well as my review of the seven executed "slips" in this matter which I understand have been designated as Petitioner's Exhibits 1(a)-7(a) and referred to as the five "Realm Specific Agreements," the "Quota Share Agreement," and the "Facility Quota Share Agreement" (hereinafter referred to as the "Executed Slips.")

10. A "slip" is a binding contract setting forth the terms and conditions as agreed between the parties.

11. In 1997 and 1998, "arbitration clauses" were standard provisions in reinsurance agreements entered into by the London insurance market.

12. In 1997 and 1998, a reference to an "arbitration clause" in a slip would have unambiguously indicated to a London insurance market underwriter that the parties to the contract agreed to submit their disputes to arbitration.

13. Since the mid-1980's, London insurance market underwriters have included "service of suit clauses" in reinsurance contracts to allow United States cedents to obtain United States jurisdiction over foreign reinsurers with which they transact business in the event of a dispute. "Service of suit clauses" are designed to relieve U.S. cedents from having to pursue litigation in a foreign jurisdiction.

14. In 1997 and 1998, "service of suit clauses" were standard provisions in reinsurance agreements entered into between U.S. cedents and their foreign reinsurers.

15. In 1997 and 1998, a reference to a "service of suit clause" in a slip with a U.S. cedent would have unambiguously indicated to a London insurance market underwriter that as a foreign reinsurer, the London reinsurer was agreeing to subject itself to the jurisdiction of the United States courts if invoked by the cedent.

16. There is no material difference between the references in the Executed Slips to "Service of Suit Clause U.S.A," "Service of Suit Clause - USA," or "Service of Suit Clause." In 1997 and 1998, a London insurance market underwriter would have understood such references to refer to the standard U.S. "service of suit clause" wording in the Lloyd's policy wording book.

17.     The Lloyd's policy wording book is a reference manual of standard policy forms and clauses that have been approved by the Lloyd's Market Association and available for general use by all Lloyd's underwriters.

18.     The standard U.S. "service of suit clause" found in the Lloyd's policy wording book as of 1997 and 1998 provided, in part, as follows:

> It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction in the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

19.     In 1997 and 1998, a London insurance market underwriter would have understood that a "service of suit clause" could be utilized by the U.S. cedent to compel arbitration in the United States, challenge an arbitration award in the United States or enforce an arbitration award in the United States.

20.     In 1997 and 1998, a London insurance market underwriter would have understood that each of varying references to a "service of suit clause" in the Executed Slips unambiguously meant that the London reinsurer was relinquishing the right to have a dispute resolved by any court outside of the United States.

21.     In 1997 and 1998, a London insurance market underwriter would have understood that the reference to an "arbitration clause" in the Executed Slips unambiguously meant that the London reinsurer agreed to submit disputes to arbitration.

22.     In 1997 and 1998, a London insurance market underwriter would have understood that each of the Executed Slips' references to both an "arbitration clause" and

4

some variation of a "service of suit clause" unambiguously compelled the London reinsurer, if requested by the U.S. cedent, to submit to the jurisdiction of the Courts of the United States and arbitrate such disputes subject to the law and jurisdiction of the Courts of the United States.

23. The fact that the standard U.S. "service of suit" clause preserves the right of a foreign reinsurer to seek a "transfer of a case to another Court," would not have meant to a London market underwriter that the reinsurer can transfer the case to a court outside the United States. To the contrary, in 1997 and 1998, a London market underwriter would have understood that this language within the "service of suit clause" provided the reinsurer only with the right to transfer the case from one "competent Court" in the United States to another "competent Court" in the United States.

24. The contents of this my Affidavit are true to the best of my knowledge and belief.

SWORN before me, Darren Thompson of Clausen Miller LLP, 148 Leadenhall Street, London EC3V 4QT

A Solicitor empowered to administer oaths

dated 10 May 2004

M. J. Beckham.

5