

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 MAY 26  P 3: 52

U.S. DISTRICT COURT
DISTRICT OF MASS.

In the Matter of the Arbitration Proceedings between

JOHN HANCOCK LIFE INSURANCE COMPANY,
    Petitioner,

    And

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

04-10181 MLW

## AFFIDAVIT OF JAMES H. HUNT

James H. Hunt, being duly sworn, deposes and says:

1.    I reside in England at Church Farm, Monk Soham, Suffolk.  I have been employed or engaged within the London insurance and reinsurance market for thirty-four years, primarily as an underwriter both at Lloyd's and with Insurance Companies but for the past nine years as an independent consultant and market expert.

2.    My career details are given in full in Exhibit 1 as attached hereto but can be summarised as follows.

3.    I started as an entry clerk at a Lloyd's box in 1967.  After three years' training I took a position outside Lloyd's with an underwriting agency specialising in US Casualty business.  I achieved underwriter status in 1974, handling all classes of US Casualty insurance and reinsurance business.  The agency was the largest of its kind in the market at that time.  In 1981 I was approached to head the underwriting at a newly formed insurance company.  Most of the business written (a mix of property and casualty insurance and reinsurance business including LMX business[1] ) emanated directly or indirectly from the US.  In 1984 I was appointed Deputy Underwriter at a Lloyd's syndicate which specialised in US Casualty and LMX Personal Accident reinsurance

---

[1]  Excess of loss reinsurances of Lloyd's syndicates and London market companies.

AFFIDAVIT OF JAMES H. HUNT

business.

    4.    In 1986 I was approached to take over the US Casualty underwriting at another Lloyd's syndicate (writing, in the main, reinsurance business, often as leader, including LMX Casualty business) and in 1990 I was approached to head the US Professional Indemnity underwriting department at the London market's then largest company reinsurer of US and LMX business.

    5.    In 1992 I joined an insurance services company in order to start up an underwriting investigations unit, leaving in 1995 to set up my own underwriting investigations business.  Increasingly, since setting up on my own, I have been engaged as an underwriting expert and, more recently, as an arbitrator, which two activities now account for almost all of my time.

    6.    All told, I spent nine years in Lloyd's and nearly sixteen years with London market companies actively involved in underwriting.

    7.    During my time as an underwriter, more often than not I was the lead underwriter of that business (either the Lloyd's lead or the Company lead) in which capacity I reviewed and/or agreed countless wordings and reinsurance agreements. Since moving to undertaking underwriting investigations and as an underwriting expert I have broadened considerably the scope of my underwriting knowledge and expertise through being introduced to many other fields of underwriting - such activities have necessitated my reviewing many varied reinsurance agreements including those for contracts which were negotiated as recently as a year or two ago.

    8.    I have prepared this affidavit at the request of Clyde & Co, solicitors for Sphere Drake Insurance Limited, in order to provide the court with my knowledge of the custom and practice in the London market relative to including arbitration clauses and service of suit clauses in reinsurance contracts.

2

## AFFIDAVIT OF JAMES H. HUNT

9.    The opinions and views I express in this affidavit are from my own knowledge and experience.

10.    I do not recall seeing any reinsurance contracts placed by London brokers during the past twenty years or so that have not incorporated an arbitration clause.  The arbitration clauses have varied in their terms and application, but they have all had in common the fact that the parties to the contract agree that any dispute between them arising out of the contract shall be referred to arbitration.

11.    In the great majority of the arbitration clauses I have reviewed in reinsurance contracts that have been placed by London brokers, and certainly since 1992 in my capacity as an investigator and underwriting expert, the seat of arbitration has been London and the applicable law has been the law of England.  This is not surprising since the contracts have been placed by a London broker, with, in the main, London market reinsurers or have been led by London market reinsurers, the Cover Note has been issued in London and the contract documents have usually been signed in England by a bureau on behalf of reinsurers (or the majority of them).  Besides which, the London market is perceived as being two things - one, the centre of reinsurance excellence where the world's insurers come to place their reinsurances - the other, the international centre of arbitration for the resolution of disputes throughout the world.  London is often the chosen forum for reinsurance disputes and English law the chosen law for reinsurance contracts involving parties domiciled in different countries.

12.    It has always been usual for the arbitration clauses in reinsurance contracts placed by London brokers to specify the city (or country) where the arbitration proceedings are to be held - referred to as the seat of arbitration.  It has also always been usual for the arbitration clause to specify the applicable law that shall apply to the arbitration.  But historically the other features of arbitration clauses have tended to vary

3

AFFIDAVIT OF JAMES H. HUNT

from broker to broker (who performed the initial drafting of the contract) and from reinsurer to reinsurer (according to their preferences and likes and dislikes).

13.    Towards the end of the 1980s some of the London company market leaders recognised the sense in having a standard arbitration clause and rules for conducting arbitrations that were tailored specifically to the needs of the insurance and reinsurance industry.

14.    In 1991 ARIAS (UK)[2] was formed by a group of underwriters and brokers together with solicitors and barristers specialising in insurance and reinsurance disputes. ARIAS (UK) set about drafting arbitration rules specifically geared to the needs of the insurance and reinsurance industry for world-wide use by the parties to any insurance or reinsurance dispute. The ARIAS Arbitration Rules were introduced in 1994 and revised in 1997 following the coming into force of the English Arbitration Act 1996.

15.    At the same time as publication of the ARIAS Arbitration Rules, ARIAS (UK) recommended the ARIAS Arbitration Clause be used in insurance and reinsurance contracts, both facultative and treaty. A copy of the ARIAS Arbitration Clause and the Notes thereto are attached hereto as Exhibit 2. The ARIAS Arbitration Clause opens *"All disputes and differences arising under or in connection with this contract shall be referred to arbitration under ARIAS Arbitration Rules."*.

16.    In the ARIAS Arbitration Clause the seat of arbitration and the proper law of the contract can be agreed by the parties at the time of negotiating the contract or at the contract wording drafting stage, but in default of a specific choice the seat of arbitration is always London. Unless the parties have chosen a particular law it is for the arbitrators to decide which law applies to the contractual obligations of the parties. This is set out under the Notes that form part of Exhibit 2.

---

[2]  A.I.D.A. Reinsurance and Insurance Arbitration Society (UK), being a UK-based Chapter of AIDA (Association Internationale de Droit des Assurances).

4

AFFIDAVIT OF JAMES H. HUNT

17.   The ARIAS Arbitration Clause is one attempt in more recent times to adopt a standardised approach to arbitration clauses. It is not exclusive.  The London market is diverse.  Some segments of the market have adopted standard policy forms and contract wordings which include an arbitration clause.

18.   The London Marine market's Joint Excess Loss Committee ("JELC"), for example, adopted a set of standard clauses in 1997 which together comprise the standard excess of loss reinsurance contract for use in that market.  Clause 15 deals with Arbitration.  A copy of Clause 15 is attached hereto as Exhibit 3.  The clause opens *"15.1    The parties agree that prior to recourse to courts of law any dispute between them concerning the provisions of this contract shall first be the subject of arbitration.".*

19.   Unless otherwise agreed by the parties at the time of negotiating the contract or at the contract wording drafting stage and specified as such in the contract schedule, the clause provides at ¶15.9 that the seat of arbitration shall be in London and the arbitrators shall apply English law as the proper law of the contract.

20.   The JELC contract clauses do not include a service of suit clause.

21.   Another example is the London Personal Accident excess of loss reinsurance market ("LMX PA market") - which is about as close to the business the subject of these Arbitration Proceedings as one can get - which in 1992 adopted a standard contract wording known as "LMX P.A.1. - 1992".[3]

22.   A copy of the first page of LMX P.A.1. - 1992 is attached hereto as Exhibit 4, together with a copy of Article 21.

23.   At Article 21 of that wording is the Arbitration Clause.  It opens *"This Article shall form a separate Agreement between the Reinsured hereon and the Reinsurers hereunder from the main Agreement ... All matters in difference between the*

---

[3]   Also known as LSW148A(1/92).

AFFIDAVIT OF JAMES H. HUNT

*Reinsured and the Reinsurers ... in relation to the main Agreement, including its*
*formation and validity, and whether arising during or after the period of the main*
*Agreement, shall be referred to an Arbitration Tribunal in the manner hereinafter set*
*out.".*

24.    In the penultimate paragraph Article 21 provides that *"[T]he seat of the*
*Arbitration shall be in London and the Arbitration Tribunal shall apply the laws of England*
*as the proper law of the main Agreement.".*

25.    The LMX P.A.1. - 1992 wording does not contain a service of suit clause.

26.    In my experience and to my knowledge, where reinsurance contracts
include arbitration clauses it is always the case that disputes between the parties are
referred to and settled exclusively through arbitration.  The parties never have the option
to refer to the courts as a replacement for arbitration.  This is always the case irrespective
of which law may apply.  Furthermore, the circumstances in which a party to the
arbitration may challenge the award of the arbitrators are usually very limited - this varies
according to the law under which the arbitration proceedings are held.

27.    There is always the danger that once the award of the arbitrators has been
published, the losing party or one of the losing parties chooses not to comply with the
award and refuses to pay the sum awarded against them.

28.    For these reasons, in my experience many, although not all, US
reinsureds have included service of suit clauses in their reinsurance agreements.  The
clauses in use have tended to vary in their construction but have a central purpose - the
reinsurer has to submit to the jurisdiction of a US court (of competent jurisdiction) in the
event of them failing to pay an arbitration award.  The existence of a service of suit clause
requiring submission to US jurisdiction in the event of failure to pay an award is usually a
persuading factor for the reinsurer who might otherwise decide to refuse to pay up and

6

AFFIDAVIT OF JAMES H. HUNT

adopt the approach of "come and get me" in the belief that (for many possible reasons) his country's law is unlikely to uphold the award.

29.    The inclusion of a service of suit clause for a US reinsured does not, however, automatically guarantee recovery of an arbitration award from a non-paying party since the latter may not have any assets in the US to attach.

30.    I have always understood that the inclusion of a service of suit clause in reinsurance agreements which include an arbitration clause is a mechanism whereby each reinsurer agrees to submit to the jurisdiction of a US court of competent jurisdiction in the event of their failure to pay an arbitration award.

31.    I have always understood that the inclusion of a service of suit clause in a reinsurance agreement which includes an arbitration clause does not provide an alternative to arbitration or replace or revise any of the terms of the arbitration clause, nor does it provide an alternative to or vary the choice of law or seat of arbitration specified in the arbitration clause or as may be specified elsewhere within the reinsurance contract.

32.    I have always understood that where the reinsurance contract and/or the arbitration clause specifies that the contract is governed by the law of a particular country other than US law (English law, for example), or governed by English Law in the absence of the parties specifying their choice of law, the mere inclusion of a service of suit clause does not amend the contract so that it is governed by US law or any other law.

33.    I have always understood that where the arbitration clause specifies that the seat of arbitration shall be in a particular city outside the US or in a country other than the US, or shall be in London, England, in the absence of the parties specifying their choice of the seat of arbitration, the mere inclusion of a service of suit clause does not amend the arbitration clause so that the seat of arbitration is moved to the US.

7

AFFIDAVIT OF JAMES H. HUNT

34.    I have never understood a service of suit clause to be a choice of law clause or a seat of arbitration determination clause.

35.    I confirm that my foregoing comments relating to arbitration clauses and service of suit clauses are relevant to the period of the contracts in dispute.

36.    I have also been requested in this affidavit to address certain paragraphs in the affidavit of Malcolm J. Beacham in these proceedings.

A.    BEACHAM ¶13.

37.    At ¶13. of his affidavit Mr Beacham states *"Since the mid-1980's, London insurance market underwriters have included "service of suit clauses" in reinsurance contracts to allow United States cedents to obtain United States jurisdiction over foreign reinsurers with which they transact business in the event of a dispute. "Service of suit clauses" are designed to relieve U.S. cedents from having to pursue litigation in a foreign jurisdiction. "*.

38.    Service of suit clauses have been included in reinsurance contracts which have been placed in the London market and which reinsure US insurance/reinsurance companies not at the instigation of London market underwriters, as Mr Beacham states, but usually at the instigation of the US intermediaries.  Nothing set down in the arbitration clause is overridden through the inclusion of a service of suit clause in the reinsurance contract.  The inclusion of a service of suit clause does not provide the US cedent with the option of pursuing litigation over arbitration, nor does it provide the US cedent with the ability to change the seat of arbitration or change the law of the contract from that specified in the arbitration clause.

B.    BEACHAM ¶19.

39.    At ¶19. of his affidavit Mr Beacham states *"In 1997 and 1998, a London insurance market underwriter would have understood that a "service of suit clause" could*

8

AFFIDAVIT OF JAMES H. HUNT

*be utilized by the U.S. cedent to compel arbitration in the United States, challenge an*

*arbitration award in the United States or enforce an arbitration award in the United*

*States.".*

     40.   It is true that in 1997 and 1998 a London insurance market underwriter

would have understood that a service of suit clause would permit the US cedent to apply

to a US court (of competent jurisdiction) to enforce an arbitration award in circumstances

where a foreign reinsurer has failed to pay an arbitration award handed down outside the

US.

     41.   In circumstances where a US cedent has sought the intervention of a US

court in compelling a party to arbitration, the US court cannot override the seat of

arbitration or the choice of law as specified in the arbitration clause (or specified

elsewhere within the reinsurance contract) or, where the seat of arbitration or choice of

law is not specified, cannot override London, England, as the seat of arbitration or

English law as the proper law governing the contract (in accordance with the custom and

practice of reinsurers in the London insurance market[4] in 1997 and 1998 in

circumstances where the seat of arbitration or choice of law is not specified).

C.     BEACHAM ¶20.

     42.   At ¶20 of his affidavit Mr Beacham states *"In 1997 and 1998, a London*

*insurance market underwriter would have understood that each of varying references to a*

*"service of suit clause" in the Executed Slips unambiguously meant that the London*

*reinsurer was relinquishing the right to have a dispute resolved by any court outside of the*

*United States.".*

     43.   Mr Beacham, in my opinion, is wrong to make this statement, since a

---

[4]  As I have demonstrated earlier in this affidavit through the ARIAS Arbitration Clause, the Arbitration clause
contained within the JELC set of standard clauses (Clause 15) and the Arbitration Clause contained within the LMX
P.A.1. - 1992 wording.

AFFIDAVIT OF JAMES H. HUNT

London insurance market underwriter in 1997 and 1998 would have understood the varying references to a service of suit clause in the Executed Slips, all of which include an arbitration clause, to mean that the reinsured could apply to a US court (of competent jurisdiction) to enforce an arbitration award.

D.    BEACHAM ¶22.

44.    At ¶22. of his affidavit Mr Beacham states *"In 1997 and 1998, a London insurance market underwriter would have understood that each of the Executed Slips' references to both an "arbitration clause" and some variation of a "service of suit clause" unambiguously compelled the London reinsurer, if required by the U.S. cedent, to submit to the jurisdiction of the Courts of the United States and arbitrate such disputes subject to the law and jurisdiction of the Courts of the United States.".*

45.    Mr Beacham, in my opinion, is wrong to make this statement, since a London insurance market underwriter in 1997 and 1998 would have understood reference to an arbitration clause in the Executed Slips to mean that arbitration was the sole remedy for the resolution of disputes between the US cedent and the London reinsurer and, in accordance with the custom and practice of reinsurers in the London insurance market (as I described earlier), that in the absence of anything specifically stated in the Executed Slips to the contrary, the seat of arbitration would be London and the law governing the contract would be English law.  Such an underwriter would also have understood that reference to a service of suit clause in the Executed Slips meant that the US cedent could apply to a US court (of competent jurisdiction) to enforce an arbitration award.

E.    BEACHAM ¶23.

46.    At ¶23. of his affidavit Mr Beacham states *"The fact that the standard U.S. "service of suit" clause preserves the right of a foreign reinsurer to seek a "transfer*

10

AFFIDAVIT OF JAMES H. HUNT

*of a case to another Court," would not have meant to a London market underwriter that*

*the reinsurer can transfer the case to a court outside the United States. To the contrary,*

*in 1997 and 1998, a London market underwriter would have understood that this*

*language within the "service of suit clause" provided the reinsurer only with the right to*

*transfer the case from one "competent Court" in the United States to another*

*"competent Court" in the United States.".*

47.    I have assumed that "case" in the foregoing paragraph is reference to the

petition to compel arbitration and not reference to the dispute itself, proposed to be

arbitrated. There is nothing stated within the service of suit clause which prevents or bars

the transfer of a case to another court, whether to a US court or to a court outside the

US, and Mr Beacham is wrong to state that a London market underwriter would read

that interpretation into the service of suit clause. In my opinion, in 1997 and 1998 a

London market underwriter would have understood from the language of the service of

suit clause that the clause does allow for the transference of a case to a court outside the

US, there being nothing specified within the clause to the contrary.

48.    I confirm that the contents of this affidavit are true to the best of my

knowledge and belief.

I make this affidavit on 24th May 2004.

....................... (James H. Hunt)

Sworn on 24 May 2004 at Woodbridge Suffolk England

Before me,

....................... (Notary Public)

( C. J. BIRD )

11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the Matter of the Arbitration Proceedings between

JOHN HANCOCK LIFE INSURANCE COMPANY,
    Petitioner,

        And

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

Civil Action No.
04-10181 MLW

This is the exhibit referred to in the Affidavit of JAMES H. HUNT, marked
"Exhibit 1" and sworn this 26th day of May 2004.

Before me,

Notary Public    ( COSIRA )

EXHIBIT 1 TO THE AFFIDAVIT OF JAMES H. HUNT

My insurance experience commenced as an Assistant to the Underwriters at J R Rooper and Others, Lloyd's Syndicate 440/47 from March 1967 to 1970. For some of this time I was seconded to the sister Aviation syndicate, Lloyd's Syndicate 48 "Ariel".

In September 1970 I joined H S Weavers (Underwriting) Agencies Ltd. Initially I spent time in the Accounts and Claims sections during which time I became involved in checking and signing policies and (to a limited extent) drafting policy wordings. In October 1972 I was appointed Assistant Underwriter. In July 1974 I was appointed Assistant Director and in July 1976 an Executive Director. From 1974 onwards my underwriting included writing umbrella liability business, both primary and excess. At the time of leaving in March 1981 I had full underwriting authority for all classes of Property, Casualty and Treaty business and responsibility for underwriting records, systems, statistics and analyses. Until 1976 I had also assisted the Underwriter by checking and approving outwards excess of loss reinsurance agreements prior to their formal signature. Underwriting at H S Weavers ceased during 1990.

I was appointed Chief Non-Marine Underwriter for and Director of Ancon Insurance Company (UK) Ltd in March 1981. I was responsible for all underwriting and claims administration, including purchase of outwards reinsurance. I underwrote a broad general book of direct and reinsurance property and liability business which included an LMX account. Ancon is presently in run-off.

In December 1984 I was appointed Deputy Underwriter at C J Warrilow and Others, Lloyd's Syndicate 553 and Director of the Managing Agency, CJW (Underwriting Agencies) Ltd. I was jointly responsible for the re-writing of the North American Liability Account, both direct and reinsurance, which included reinsurance assumed business. Syndicate 553 ceased at the end of 1987 and evolved into Syndicate 1101, one of the better regarded personal accident and liability syndicates at Lloyd's until its relatively recent demise. The run-off of Syndicate 1101 is being managed by Claims Management Group Ltd.

From April 1986 until September 1990 I was a class underwriter with C W Spreckley and Others, Lloyd's Syndicate 1007 (and Syndicate 546 until 1988), specifically responsible for North American Liability, Professional Indemnity and Medical Malpractice Classes, and a Casualty LMX account. I was also a Director of the Managing Agency, Spreckley Villers Hunt and Company Ltd (which became SVB Syndicates, part of SVB Holdings plc). Syndicate 1007 continues to underwrite for 2004.

From October 1990 to March 1992 I was head of one of three underwriting departments (later head of one of two) at CNA Reinsurance of London Ltd. I was responsible for North American Professional Indemnity Treaty Business, Directors and Officers Liability, Bankers Bonds, Fidelity, Hospital Professional Liability, Property and Miscellaneous classes. From April 1991 this expanded to include Physicians and

1

EXHIBIT 1 TO THE AFFIDAVIT OF JAMES H. HUNT

Surgeons Professional Liability and all classes of Professional Indemnity business worldwide. I was also a Director of the company. CNA Re ceased underwriting in London during September 2001 and, as CX Reinsurance Company Ltd, is presently being run-off.

In April 1992 I was appointed head of the London office of Elliston, an Anglo American insurance services company and served on both the London and US boards. I was involved in leading several reinsurance investigations. I left Elliston in May 1995 in order to set up my own business. Elliston has since been acquired by Insurance Services Office Inc, New York but continues to trade as Elliston.

In June 1995 I established Hunt & Associates, an independent international reinsurance and insurance investigations consultancy where I have been concerned primarily with underwriting investigations, underwriting reviews and record inspections. In addition I have been retained as an underwriting expert in more than forty disputes and have been appointed an arbitrator in nine disputes. Underwriting expert and arbitrator engagements presently account for almost all of my time.

· · ·

I was born in London, England, on 21 March 1949.

I attended a Livery Company Grammar school, Owen's, then of London EC1.

I am a Member of A.R.I.A.S. (UK) / A.I.D.A. Reinsurance and Insurance Arbitration Society of the UK (admitted as Panel Member, May 2002).

I am a Member of the Chartered Institute of Arbitrators (admitted 30 September 1999).

I am a Member of British Insurance Law Association (October 1995)

I was a Member of Lloyd's for years 1987, 1988, 1989 and 1990. Each of my syndicate participations closed naturally into their successor years. I have been a Member of the Association of Lloyd's Members since 1987.

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the Matter of the Arbitration Proceedings between

JOHN HANCOCK LIFE INSURANCE COMPANY,
    Petitioner,

        And

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

Civil Action No.
04-10181 MLW

This is the exhibit referred to in the Affidavit of JAMES H. HUNT, marked "Exhibit 2" and sworn this 24th day of May 2004.

Before me,

Notary Public

EXHIBIT 2 TO THE AFFIDAVIT OF JAMES H. HUNT

# ARIAS Arbitration Clause

All disputes and differences arising under or in connection with this contract shall be referred to arbitration under ARIAS Arbitration Rules.

The Arbitration Tribunal shall consist of three arbitrators, one to be appointed by the Claimant, one to be appointed by the Respondent and the third to be appointed by the two appointed arbitrators.

The third member of the Tribunal shall be appointed as soon as practicable (and no later than 28 days) after the appointment of the two party-appointed arbitrators. The Tribunal shall be constituted upon the appointment of the third arbitrator.

The arbitrators shall be persons (including those who have retired) with not less than ten years' experience of insurance or reinsurance within the industry or as lawyers or other professional advisers serving the industry.

Where a party fails to appoint an arbitrator within 14 days of being called upon to do so or where the two party-appointed arbitrators fail to appoint a third within 28 days of their appointment, then upon application A.R.I.A.S. (UK) will appoint an arbitrator to fill the vacancy. At any time prior to the appointment by A.R.I.A.S. (UK) the party or arbitrators in default may make such appointment.

The Tribunal may at its sole discretion make such orders and directions as it considers to be necessary for the final determination of the matters in dispute. The Tribunal shall have the widest discretion permitted under the law governing the arbitral procedure when making such orders or directions.

The seat of arbitration shall be.........................

The proper law of this contract shall be the law of.........................



EXHIBIT 2 TO THE AFFIDAVIT OF JAMES H. HUNT

# Recommended ARIAS Arbitration Clause

With the publication of the ARIAS Arbitration Rules, we recommend that a revised arbitration clause be used in insurance and reinsurance contracts, both facultative and treaty.

The recommended ARIAS Arbitration Clause is set out on the next page and is commended for world-wide use.

The ARIAS Arbitration Clause may be incorporated into a reinsurance contract by adding the following three words to any placement slip or slip contract:

**"ARIAS Arbitration Clause"**

## Notes

(i)  In default of a specific choice of the seat of arbitration, this will be London.

(ii) Unless the Parties choose particular law or principles, the arbitrators will decide what law applies to the contractual obligations.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the Matter of the Arbitration Proceedings between

JOHN HANCOCK LIFE INSURANCE COMPANY,
     Petitioner,

          And

SPHERE DRAKE INSURANCE LIMITED,
     Respondent.

Civil Action No.
04-10181 MLW

This is the exhibit referred to in the Affidavit of JAMES H. HUNT, marked
"Exhibit 3" and sworn this _24th_ day of May 2004.

Before me,

Notary Public (CONSINI)

EXHIBIT 3 TO THE AFFIDAVIT OF JAMES H. HUNT

## 15  ARBITRATION

15.1   The parties agree that prior to recourse to courts of law any dispute between them concerning the provisions of this contract shall first be the subject of arbitration.

15.2   The following arbitration procedure shall be used in any dispute concerning this contract, and shall exist as a separate contract if there is a dispute over the validity or formation of the contract.

15.3   Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the claimant (the party requesting arbitration) shall appoint an arbitrator and give written notice thereof to the respondent. Within thirty days of receiving such notice the respondent shall appoint an arbitrator and give written notice thereof to the claimant, failing which the claimant may apply to the appointor hereinafter named to nominate an arbitrator on behalf of the respondent.

15.4   Before the commencement of arbitration proceedings the two arbitrators shall appoint a third arbitrator who shall act as chairman of the tribunal. Should they fail to appoint such a third arbitrator within thirty days of the appointment of the respondent's arbitrator then either of them or either of the parties may apply to the appointor for the appointment of the third arbitrator. The arbitrators appointed by the parties in dispute shall decide the verdict; if they cannot agree, they shall seek the verdict of the chairman of the tribunal, which shall prevail.

15.5   Unless the parties otherwise agree the arbitration tribunal shall consist of persons with not less than ten years' experience of insurance or reinsurance.

15.6   The arbitration tribunal shall have power to fix all procedural rules for the holding of the arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of the documents, examination of witnesses and any other matter whatsoever relating to the conduct of the arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

15.7   The appointor shall be the person indicated in section L of the schedule.

15.8   All costs of the arbitration shall be at the discretion of the arbitration tribunal who may direct to and by whom and in what manner they shall be paid.

15.9   The seat of the arbitration shall be in London and the arbitration tribunal shall apply the laws of England as the proper law of this contract unless indicated in section L to the schedule.

15.10  The award of the arbitration tribunal shall be in writing and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the Matter of the Arbitration Proceedings between

JOHN HANCOCK LIFE INSURANCE COMPANY,
    Petitioner,

        And

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

Civil Action No.
04-10181 MLW

This is the exhibit referred to in the Affidavit of JAMES H. HUNT, marked
"Exhibit 4" and sworn this 24th     day of May 2004.

Before me,

Notary Public

EXHIBIT 4 TO THE AFFIDAVIT OF JAMES H. HUNT

STANDARD WORDING LMX P.A.I. - 1992

EXCESS OF LOSS REINSURANCE AGREEMENT

made between

**THE REINSURED AS SPECIFIED
IN THE SCHEDULE ATTACHED HERETO**

(hereinafter referred to as the "REINSURED")

and

**CERTAIN UNDERWRITING MEMBERS OF LLOYD'S
AND/OR INSURANCE AND REINSURANCE COMPANIES
WHO HAVE SUBSCRIBED TO THIS AGREEMENT,
EACH TO THE EXTENT OF THE PROPORTION UNDERWRITTEN
AND NOT ONE FOR THE OTHER, AS SET OUT IN THE
SIGNING SCHEDULES ATTACHED HERETO**

(hereinafter referred to as the "REINSURERS")

WHEREBY IT IS AGREED BETWEEN THE PARTIES AS FOLLOWS:

## ARTICLE 1    INTEREST CLAUSE

This Agreement is to indemnify the Reinsured in respect of all losses arising under any and all policies and/or contracts of Insurance and/or Reinsurance (hereinafter referred to as Original Policies) in respect of business underwritten by them, as detailed in the Schedule attached hereto, subject to the terms and conditions set forth herein.

## ARTICLE 2    PERIOD CLAUSE

This Agreement is in respect of all losses occurring during the Period specified in the Schedule attached hereto.

## ARTICLE 3    EXTENDED EXPIRATION CLAUSE

Reinsurers agree that if this Agreement should expire whilst a loss, as defined, is in progress, then it is agreed that subject to the other conditions of this Agreement, Reinsurers shall be liable as if the whole loss had occurred during the currency of this Agreement.

No such loss may be used for the purposes of calculating both the Reinsured's Ultimate Net Loss under this Agreement and that for any renewal of this Agreement.

## ARTICLE 4    NON-RENEWAL CLAUSE

In the event of this Agreement not being renewed, if so requested by the Reinsured, prior to the expiry date of this Agreement, it is agreed to extend this Agreement to cover the liability of the Reinsured for all losses occurring during the following twelve month period (and for such further periods as to be mutually agreed) in respect of all business to which the Reinsured may be committed prior to the expiry date of this Agreement at terms to be mutually agreed prior to inception of such extension and each period of such run-off to be considered as a separate Agreement.

EXHIBIT 4 TO THE AFFIDAVIT OF JAMES H. HUNT

**ARTICLE 21  ARBITRATION CLAUSE**

This Article shall form a separate Agreement between the Reinsured hereon and the Reinsurers hereunder from the main Agreement (the terms and conditions of which are more fully expressed hereintofore).

All matters in difference between the Reinsured and the Reinsurers (hereinafter referred to as "the parties") in relation to the main Agreement, including its formation and validity, and whether arising during or after the period of the main Agreement, shall be referred to an Arbitration Tribunal in the manner hereinafter set out.

Unless the parties agree upon a single Arbitrator within thirty days of one receiving a written request from the other for Arbitration, the Claimant (the party requesting Arbitration) shall appoint his Arbitrator and give written notice thereof to the Respondent. Within thirty days of receiving such notice the Respondent shall appoint his Arbitrator and give written notice thereof to the Claimant, failing which the Claimant may apply to the Appointer hereinafter named to nominate an Arbitrator on behalf of the Respondent.

Should the Arbitrators fail to agree, then they shall within thirty days of such disagreement appoint an Umpire to whom the matter in difference shall be referred. Should the Arbitrators fail within such period to appoint an Umpire, then either of them or either of the parties may apply to the Appointer for the appointment of the Umpire.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons employed or engaged in a senior position in Insurance or Reinsurance Underwriting.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

The Appointer shall be the Chairman of Lloyd's and/or the Chairman of The London Insurance and Reinsurance Market Association.

All costs of the Arbitration shall be in the discretion of the Arbitration Tribunal who may direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in London and the Arbitration Tribunal shall apply the laws of England as the proper law of the main Agreement.

The award of the Arbitration Tribunal shall be in writing and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.

LSW148A(1/92)