IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 MAY 26 P 3: 52

U.S. DISTRICT COURT
DISTRICT OF MASS.

-----------------------------------------------------------------

In the Matter of the Arbitration Proceedings Between

JOHN HANCOCK LIFE INSURANCE COMPANY,
    Petitioner,

        and

SPHERE DRAKE INSURANCE LIMITED,
    Respondent.

Civil Action No. 04 10181
MLW

-----------------------------------------------------------------

## SPHERE DRAKE'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Defendant Sphere Drake Insurance Limited ("Sphere Drake") submits the following as its Statement of Material Facts Pursuant to Local Rule 56.1 ("Sphere Drake's Statement"). In Sphere Drake's Statement, Sphere Drake refers to putative reinsurance agreements between John Hancock Life Insurance Company ("John Hancock") and Sphere Drake as "contracts." In so doing, Sphere Drake does not agree that any of the twenty-nine "contracts" between Sphere Drake and Hancock accepted by EIU under the Binding Authority (referred to herein as the "John Hancock/Sphere Drake Ceded Contracts") is a valid or enforceable contract. Moreover, by discussing the business John Hancock ceded under certain of these contracts, Sphere Drake does not thereby agree that such cessions were effective or appropriate under those purported contracts. As described in the Affidavit of Raymond Gordon Bell[1] ("Bell Aff."), Sphere Drake's position is that all twenty-nine John Hancock/Sphere Drake Ceded Contracts, including the seven contracts at issue before this Court (the "Seven Agreements") are void.

---

[1] Submitted as Docket Entry No. 20 on February 4, 2004 (with original following on February 5, 2004) in conjunction with Sphere Drake's Motion to Dismiss or in the Alternative Stay the Petition to Compel Arbitration Proceedings.

## Background

1.  In January 1997, Sphere Drake granted a binding authority (i.e., an agency agreement) in respect of personal accident business and related classes (the "Binding Authority") to Horace Holman International Limited ("HHI"). (Binding Authority, Exhibit A to the Appendix of Exhibits to Sphere Drake's Local Rule 56.1 Statement of Material Facts ("App. Ex.") at 1; App. Ex. B, 1 Broad at ¶ 1;[2] Bell Aff. ¶ 5)

2.  Under the heading "Named Underwriters," the Binding Authority states "The persons authorised to accept and who are responsible for the operation of this Agreement are: J.H. Whitcombe, Esq." (App. Ex. A at 1.)

3.  Euro International Underwriting Limited ("Euro") was established as an underwriting agency in about February 1997. (App. Ex. B, 1 Broad at ¶ 1.)

4.  A February 4, 1997 endorsement to the Binding Authority states that "It is hereby noted and agreed that the attached stamp impression in conjunction with the confirmation note, also attached, are approved for the binding of business under Sphere Drake Contract number 50413 and Horace Holman Cover Note Number 17X1253 underwritten 100% by Sphere Drake Insurance plc UK per Sphere Drake Underwriting Management Ltd. Sphere Drake Insurance plc UK have approved John Whitcombe as underwriter for this Contract." (App. Ex. A, Binding Authority at 5.)

5.  The first page attached to the February 4, 1997 endorsement is a form "Confirmation of Acceptance under Horace Holman Contract No. 50413 underwritten by Sphere

---

[2] Witness statements from the English Action (discussed in paragraphs 12, 96-98, *infra*) are cited herein in the form "1 Broad at ¶ 1," which refers to the First Witness Statement of Victor Broad at paragraph 1. In the English Action, the parties submitted witness statements in lieu of presenting live direct testimony of their respective witnesses. After affirming his witness statement on the witness stand, each witness was then subject to live cross-examination.

Drake Insurance Plc per Sphere Drake Underwriting Management Ltd." (App. Ex. A, Binding Authority at 6.)

      6.    The second page attached to the February 4, 1997 endorsement is the "attached stamp impression" referred to in the endorsement. The stamp includes the legend "subject to written confirmation." (App. Ex. A, Binding Authority at 5, 7.)

      7.    An endorsement to the Binding Authority dated September 1, 1997 states "It is hereby noted and agreed that 'Named Underwriters' is amended to read: The company authorised to accept and who are responsible for the operation of this agreement is Euro International Underwriting Ltd. The named underwriter being J.H. Whitcombe Esq." (App. Ex. A, Binding Authority at 9.)

      8.    Another endorsement to the Binding Authority states that "Mr Chris Henton added to authorised persons to accept as Named Underwriter." This endorsement stated that it was "with effect from 1st January, 1998." (App. Ex. A, Binding Authority at 12.)

      9.    In order to bind business on Sphere Drake's behalf, Euro, Whitcombe and Henton (collectively "EIU") were required to confirm acceptance of such business in the form of the "confirmation note" attached to the February 4, 1997 endorsement to the Binding Authority. (App. Ex. C, 1 Henton at ¶¶ 48, 51, 54.)

      10.    Over the course of eighteen months, EIU wrote 119 reinsurance contracts purportedly pursuant to the Binding Authority. (Bell Aff., ¶ 7.)

      11.    London brokers Stirling Cooke Brown Insurance Brokers Limited and Stirling Cooke Brown Reinsurance Brokers Limited (collectively "Stirling Cooke"), acting on behalf of various insurers including Hancock, placed 112 of these putative contracts with EIU. (*Id.*)

12.    Sphere Drake subsequently discovered that Stirling Cooke and EIU had colluded to defraud Sphere Drake, and filed a lawsuit in the Commercial Court in England against EIU, Stirling Cooke, and their principals (including Nick Brown and Jeff Butler, the directors of Stirling Cooke who placed the business at issue) (the "English Action").  (*Id.*, ¶¶ 6, 9.)

**The Seven Agreements**

13.    The Seven Agreements are evidenced by slips executed by EIU purportedly on behalf of Sphere Drake.  (Petitioners Exhibits in Support of John Hancock's Motion for Summary Judgment ("Petitioner's Exs.") 1(a), 2(a), 3(a), 4(a), 5(a), 6(a), 7(a).)

14.    Each of the slips was broked to EIU in London by Stirling Cooke, English brokers.  (Bell Aff., ¶ 64.)

15.    Not one of the slips for the Seven Agreements contains a choice of law provision or a forum selection clause, or even mentions the state of Massachusetts.  (Petitioner's Exs. 1(a), 2(a), 3(a), 4(a), 5(a), 6(a), 7(a).)

16.    Each of the slips for the Seven Agreements includes the statement "Arbitration Clause" and either "Service of Suit Clause U.S.A." or simply "Service of Suit Clause." (*Id.*)

17.    The slips themselves, and in particular, the references to arbitration therein are the only possible documentary evidence of the purported contractual agreements between the parties. (Petitioner's Exs. 1(a), 2(a), 3(a), 4(a), 5(a), 6(a), 7(a); Bell Aff. ¶¶ 21-24, 28, 31, 55(1).)

**The Specific Realm Contracts (Program 9)**

18.    On December 24, 1997, Henton of EIU met with Nicholas Brown of Stirling Cooke at Stirling Cooke's office in London.   (App. Ex. C, 1 Henton at ¶ 261-65.)

19.    During the course of the December 24, 1997 meeting, Brown of Stirling Cooke presented and Henton of EIU provisionally accepted a group of reinsurance contracts (the

"Christmas Eve Contracts"), including the Specific Realm Contracts, by signing a "slip" for each of the contracts. (App. Ex. C, 1 Henton at ¶¶ 265, 276, 294-307.)

20.     The Specific Realm Contracts are two excess of loss and three aggregate stop loss protections wherein Sphere Drake purportedly reinsured John Hancock with respect to John Hancock's reinsurance of Realm National Insurance Company. (Petitioner's Exhibits 1(a), 2(a), 3(a), 4(a), 5(a); Bell Aff. ¶19; App. Ex. D, Henton 4/25/02, pp. 66-67.)[3]

21.     Following Henton's meeting with Brown on December 24, 1997, Henton returned to EIU's office in London and told Whitcombe (of EIU) about the placement of the Christmas Eve Contracts. (App. Ex. C, 1 Henton ¶¶ 265-66.)

22.     EIU completed "Confirmation of Acceptance" forms for the Specific Realm Contracts on December 29, 1997. (Petitioner's Exhibits 1(a), 2(a), 3(a), 4(a), 5(a).)

23.     There is no reference in the slips for the Specific Realm Contracts to choice of law or forum for the arbitration. (*Id.*)

24.     Neither EIU nor Sphere Drake ever received a draft full wording for the Specific Realm Contracts. (Bell Aff. ¶¶ 21-24, 55(1).)

25.     Neither EIU nor Sphere Drake ever agreed a full wording for the Specific Realm Contracts. (*Id.*)

---

[3] Citations herein to specific dates refer to testimony from the English Action, and the witness whose testimony is cited.

### The 95% Facility Quota Share Agreement (Program 28)

26.    Jeff Butler of Stirling Cooke offered EIU a participation on the 95% Facility Quota Share Agreement in Stirling Cooke's office in London on December 31, 1997.  (App. Ex. C, 1 Henton ¶¶ 425-26, 476 (and heading thereto).)

27.    Henton provisionally accepted the 95% Facility Quota Share Agreement on December 31, 1997.  (App. Ex. C, 1 Henton ¶¶ 476 (and heading thereto).)

28.    Whitcombe confirmed EIU's acceptance of the 95% Facility Quota Share Agreement on March 30, 1998.  (App. Ex. C, 1 Henton ¶ 488; Petitioner's Exhibit 7(a).)

29.    The 95% Facility Quota Share Agreement covered business written by JEH Re Underwriting Management Bermuda Ltd ("JEH Re") for Hancock.  (App. Ex. E, Whitcombe 3/26/02 at 85-86; App. Ex. F, 1 Brown ¶ 145.)

30.    Prior to 1998, Stirling Cooke was not involved in the 95% Facility Quota Share Agreement.  (App. Ex. F, 1 Brown ¶ 145; App. Ex. G, Butler 5/29/02 at 111-12.)

31.    Hancock placed the prior years of the 95% Facility Quota Share and a portion of the 1998 Quota Share through a different broker, D.W. Van Dyke.  (App. Ex. F, 1 Brown ¶ 145; App. Ex. G, Butler 5/29/02 at 111-12.)

32.    There is no reference in the slip for the 95% Facility Quota Share Agreement to choice of law or forum for the arbitration.  (Petitioner's Exhibit 7(a).)

33.    The slip for the 95% Facility Quota Share Agreement did not contain a provision for a full wording or that any such wording was to be agreed only by the Leading Underwriter.  (*Id.*)

34.    Neither EIU nor Sphere Drake ever received a draft full wording for the 95% Facility Quota Share Agreement.  (Bell Aff. ¶¶ 28, 55(1).)

35.     Neither EIU nor Sphere Drake ever agreed a full wording for the 95% Facility Quota Share Agreement.  (*Id.*)

36.     London Market Excess of Loss ("LMX") business was specifically excluded from the 95% Facility Quota Share prior to 1998.  (App. Ex. H, Butler 6/19/02 at 60-61.)

37.     Stirling Cooke removed the LMX exclusion from the 95% Facility Quota Share once Stirling Cooke became involved in this account.  (*Id.*)

38.     The slip for the 95% Facility Quota Share does not contain terms barring LMX business from being ceded to the 95% Facility Quota Share.  (*Id.*; Petitioner's Exhibit 7(a).)

39.     Hancock has ceded LMX business to the 95% Facility Quota Share.  (App. Ex. I, Ceded Results:  Specific Retrocessionaire Summary Report; English Judgment Part II at ¶ 639(iii).[4])

### The Quota Share Agreement (Program 33)

40.     Brown of Stirling Cooke initially presented the Quota Share Agreement to Henton at EIU's office in London on April 30, 1998.  (App. Ex. C, 1 Henton ¶ 633; App. Ex. J, 4 Henton ¶ 10; App. Ex. K, Henton 4/15/02 at 115.)

41.     EIU provisionally accepted the Quota Share Agreement on April 30, 1998.  (App. Ex. C, 1 Henton ¶ 633 (and heading thereto).)

42.     Whitcombe was present during the April 30, 1998 meeting between Brown and Henton at EIU's office in London.  (App. Ex. L, Whitcombe 3/19/02 at 49-50; App. Ex. M, Whitcombe 3/27/02 at 11-12.)

---

[4] Confidentiality restrictions, imposed by Lord Justice Thomas at Hancock's insistence, prevent Sphere Drake from submitting to this Court the correspondence referred to at Part II paragraph 639(iii) of the English Judgment.

43.    On June 10, 1998, Brown returned to EIU's office in London and had further discussions with Henton regarding the Quota Share Agreement. (App. Ex. N, Henton 5/15/02 at 86-87; App. Ex. O, Brown 7/19/02 at 122-23.)

44.    On June 19, 1998, Brown again returned to EIU's office in London, at which time further discussions regarding the Quota Share Agreement took place. (App. Ex. C, 1 Henton ¶ 640.)

45.    On June 19, 1998, Whitcombe of EIU confirmed EIU's acceptance of the Quota Share Agreement. (Petitioner's Exhibit 6(a).)

46.    There is no reference in the slip for the Quota Share Agreement to the choice of law or the forum for the arbitration. (*Id.*)

47.    Neither EIU nor Sphere Drake ever received a draft full wording of the Quota Share Agreement. (Bell Aff. ¶¶ 31, 55(1).)

48.    Neither EIU nor Sphere Drake ever agreed a full wording of the Quota Share Agreement. (*Id.*)

49.    The Quota Share Agreement covered London and international business including LMX. (App. Ex. K, Henton 4/15/02 at 122; App. Ex. N, Henton 5/15/02 at 50; App. Ex. F, 1 Brown ¶ 153.)

50.    Under "Class," the slip for the Quota Share Agreement provides as follows: "[a]ll business written by [the Reinsured] and allocated to their Personal Accident Non-Proportional Account, including London and International Non-Proportional business. . . ." (Petitioner's Ex. 6(a).)

51.    The slip for the Quota Share Agreement provides as follows: ". . . where the Reinsured has written a Personal Accident London Market Excess of Loss Reinsurance which is

based on the Standard Wording LMX PA1 but which does not contain any of the following

Standard exclusions. . . .   Then Reinsurers hereon agree to indemnify the Reinsured in respect of

losses arising from these normally excluded perils" *(Id.)*

**The Other John Hancock/Sphere Drake Ceded Contracts**

### Bermuda & JEH Corporation London Agreements ("BE & JEH CORP LON Agreements") (Program 1)[5]

52.    The BE & JEH CORP LON Agreements are comprised of eight putative excess of

loss contracts that were effective as of January 1, 1997 and provided coverage for $4,000,000

excess of $100,000.  (Bell Aff. at ¶ 33.)

53.    A true and accurate copy of a sample slip from the BE & JEH CORP LON

Agreements (the bottom layer) is attached to the Bell Affidavit at Exhibit B, tab 16.  (Bell Aff.

¶¶ 33-34; Bell Aff. Ex. B, tab 16.)

54.    The BE & JEH CORP LON Agreements are subject to arbitration in England

under English law.  (Bell Aff. ¶ 34; Bell Aff. Ex. B tab 16.)

55.    The BE & JEH CORP LON Agreements cover the same class of business as does

the Quota Share Agreement.  (Bell Aff. Ex. B tab 16; Petitioner's Exhibit 6(a).)

56.    Under "Class," the slip policies for the BE & JEH CORP LON Agreements

provide as follows:  "[a]ll business written by the Reinsured and allocated to their Personal

Accident Non-Proportional Account (including London Market Excess of Loss. . . ."  (Bell Aff.

Ex. B tab 16.)

57.    The Quota Share Agreement was effectively a renewal of the BE & JEH CORP

LON Agreements.  (App. Ex. G, Butler 5/29/02 at 123.)

---

[5] In prior submissions, Sphere Drake has referred to Program 1 as the Hancock Per JEH Re Contracts.  To avoid confusion, Sphere Drake will hereafter refer to Program 1 as the Bermuda & JEH Corporation London Agreements ("BE & JEH CORP LON Agreements").

58.    The slip for the BE & JEH CORP LON Agreements classify the business as "U.S. Reinsurance." (Bell Aff. ¶ 34; Bell Aff. Ex. B tab 16.)

59.    John Hancock and Sphere Drake are currently engaged in arbitration in England over their disputes concerning the BE & JEH CORP LON Agreements. (Bell Aff. ¶ 35.)

### Sun Life / American Phoenix Specific Agreement (Program 24)[6]

60.    The Sun Life / American Phoenix Specific Agreement was a retrocession of 50% of Hancock's reinsurance of business accepted by John Cackett (through Centaur) for Sun Life and Phoenix. (Bell Aff. ¶¶ 36-37.)

61.    The Sun Life / American Phoenix Specific Agreement reinsures United States business. (App. Ex. P, Stirling Cooke Information Sheet.)

62.    The Sun Life / American Phoenix Specific Agreement is subject to arbitration in England under English law. (Bell Aff. ¶ 38; Bell Aff. Ex. B tab 13; Bell Aff. Ex. 18 at p. 59.)

63.    The slip for the Sun Life / American Phoenix Specific Agreement classifies the business as "U.S. Reinsurance." (Bell Aff. ¶ 39; Bell Aff. Ex. B tab 13.)

64.    John Hancock and Sphere Drake are currently engaged in arbitration in England over their disputes concerning the Sun Life / American Phoenix Specific Agreements. (Bell Aff. ¶ 40.)

### John Hancock CT & PH Whole Account (Program 5)[7]

65.    The territorial scope listed on the slips for the John Hancock CT & PH Whole Account Agreements is "losses wheresoever occurring." (Petitioner's Exhibits 28(a)-31(a).)

---

[6] In prior submissions, Sphere Drake has referred to Program 24 as the JEH Re/Centaur Contract. To avoid confusion, Sphere Drake will hereafter refer to Program 24 as the Sun Life / American Phoenix Specific Agreement.

[7] In prior submissions Sphere Drake has referred to Program 5 as the Hancock/Hackett Contracts. To avoid confusion, Sphere Drake will hereafter refer to Program 5 as the John Hancock CT & PH Whole Account.

66.    Notwithstanding its position that the John Hancock CT & PH Whole Account Agreements are void, Sphere Drake has agreed to arbitrate the parties' disputes over the existence and enforceability of the John Hancock CT & PH Whole Account Agreements in a United States forum on the condition that John Hancock accept certain terms as described in Sphere Drake's February 20, 2004 letter to John Hancock's Counsel (the "O'Brien Letter"). (App. Ex. Q, O'Brien Letter.)

### Specific Bridgefield Agreement (Program 8)

67.    The territorial scope listed on the slip for the Specific Bridgefield Agreement includes "worldwide" losses. (Petitioner's Ex. 19(a).)

68.    Notwithstanding its position that the Specific Bridgefield Agreement is void, Sphere Drake has agreed to arbitrate the parties' disputes over the existence and enforceability of this purported contract in a United States forum on the condition that Hancock accept certain terms as described in the O'Brien letter. (App. Ex. Q, O'Brien Letter.)

### American Phoenix/Sun Life Specific Agreements (Program 30)[8]

69.    The territorial scope listed on the slips for the American Phoenix/Sun Life Specific Agreements is "worldwide, as original," with the original scope being "losses wheresoever occurring." (Petitioner's Exhibits 20(a)-23(a).)

70.    Notwithstanding its position that the American Phoenix/Sun Life Specific Agreements are void, Sphere Drake has agreed to arbitrate the parties' disputes over the existence and enforceability of these purported contracts in a United States forum on the condition that Hancock accept certain terms as described in the O'Brien letter. (App. Ex. Q, O'Brien Letter.)

---

[8] In prior submissions, Sphere Drake has referred to Program 30 as the Hancock/WEB VQS Contracts. To avoid confusion, Sphere Drake will hereafter refer to Program 30 as the American Phoenix/Sun Life Specific Agreements.

## Bermuda Whole Account ("BE Whole Account") (Program 12)[9]

71.    Appendix Exhibit R contains true and accurate copies of the slips for each of the four BE Whole Account Agreements. (App. Ex. R.)

72.    The slips for the BE Whole Account Agreements provide: "This contract of reinsurance shall be governed by and construed in accordance with the laws of the state of Massachusetts, U.S.A. under the jurisdiction of the courts of the State of Massachusetts, U.S.A. The Arbitration contract shall also be subject to the laws and jurisdiction of the State of Massachusetts, U.S.A." (*Id.*)

73.    The territorial scope listed on the slips for the BE Whole Account Contracts is "losses wheresoever occurring." (*Id.*)

74.    Notwithstanding its position that the BE Whole Account Contracts are void, Sphere Drake has agreed to arbitrate the parties' disputes over the existence and enforceability of these contracts in a United States forum on the condition that Hancock accept certain terms as described in the O'Brien letter. (App. Ex. Q, O'Brien Letter.)

## General Facts

75.    Hancock has demanded arbitration in Massachusetts on the Seven Agreements that contain no choice of law or forum and Sphere Drake has demanded arbitration in England on these same Seven Agreements. (Bell Aff. Ex B Tab 18, pages 30-44.)

76.    Both parties' arbitration demands with regard to these purported contracts were effective as of January 26, 2004. (*Id.*, Page 58.)

77.    On January 29, 2004, Sphere Drake filed applications in the English Commercial Court to compel Hancock to submit to arbitration over the Seven Agreements in England. (Bell

---

[9] In prior submissions, Sphere Drake has referred to Program 12 as the Hancock Direct Contracts. To avoid confusion, Sphere Drake will hereafter refer to Program 12 as the Bermuda Whole Account ("BE Whole Account").

Aff. ¶ 63 and Ex. F.)

78.    Sphere Drake's applications to the English Commercial Court seek a

determination as to where the arbitration over the Seven Agreements should take place.  (Bell

Aff. Ex. F.)

79.    Stirling Cooke is an English entity.  (Bell Aff., ¶ 64.)

80.    Nicholas Brown resides in England.  (*Id.*)

81.    Jeff Butler resides in England.  (*Id.*)

82.    EIU is an English entity.  (*Id.*)

83.    Chris Henton resides in England.  (*Id.*)

84.    John Whitcombe resides in England.  (*Id.*)

85.    JEH Re was Hancock's managing general agent with respect to the five Specific

Realm Contracts and the Quota Share Agreement.  (Petitioner's Exs. 1(b), 2(b), 3(b), 4(b), 5(b),

6(b).)

86.    JEH Re is a Bermudian entity. (App. Ex. S, Declaration of Reginald Billyard in

Support of Motion of Defendants James E. Hackett Reinsurance Corporation, JEH Re

Underwriting Management (Bermuda) Limited, and Reginald Billyard to Dismiss the Complaint

in Civil Action No. 99 Civ. 2326 ("Billyard Declaration") at ¶ 3.)

87.    Reginald Billyard was the president of JEH Re.  (App. Ex. S, Billyard Declaration

at ¶ 1.)

88.    Billyard currently resides in England.  (App. Ex. T, Companies House Listing.)

89.    All of the contracts involving Sphere Drake and JEH Re were made through a

series of London-based brokers (Stirling Cooke) and Sphere Drake's London-based agents

(EIU). (App. Ex. U, Supplemental Declaration of Reginald Billyard in Further Support of

Motion of Defendants James E. Hackett Reinsurance Corporation, JEH Re Underwriting Management (Bermuda) Limited, and Reginald Billyard to Dismiss the Complaint in Civil Action No. 99 Civ. 2326 ("Supplemental Billyard Declaration"), ¶ 5.)

90.    JEH Re maintains no office, employees or agents in the United States. (App. Ex. S, Billyard Declaration, ¶ 3.)

91.    JEH Re owns no assets or other property (including bank accounts and real property) in the United States. *(Id.)*

92.    JEH Re never negotiated with a broker located in the United States in connection with any of the contracts involving Sphere Drake and JEH Re. (App. Ex. U, Supplemental Billyard Declaration, ¶ 5.)

93.    Hancock has been represented by English legal counsel with regard to matters arising out of the purported contracts between Sphere Drake and Hancock, including the seven contracts at issue in this litigation, for more than four years.

94.    In November of 2001, Hancock agreed to arbitrate a dispute with LDG Re in England "for convenience." (App. Ex. V, November 14, 2001 Letter from Joseph P. Welch.)

95.    The arbitration provision in the contract between Hancock and LDG Re specified that the seat of the arbitration was Bermuda. *(Id.)*

96.    In 2002, Justice Thomas (now Lord Justice Thomas, sitting on the Court of Appeal and the Senior Presiding Judge for England and Wales) presided over the English Action during 110 trial days and, in July 2003, issued a lengthy and detailed judgment. (Bell Aff., ¶¶ 9-10; *see also Sphere Drake Ins. Ltd. v. Euro Int'l Underwriting Ltd.,* Case No. 2000 Folio 249, 2003 WL 21729222 (Q.B. July 8, 2003) (the "Judgment")The English Action was presided over by Lord Justice Thomas. (English Judgment.)

97.    On July 8, 2003, the Commercial Court issued its judgment in the English Action

(the "English Judgment"). (English Judgment.)

98.    A copy of the English Judgment was provided to this Court on February 11, 2004.

99.    On July 30, 2003, Lord Justice Thomas ordered that

> [n]o order shall be made for the taking of evidence in England and
> Wales in support of foreign proceedings, to which the Claimants
> [Sphere Drake] are a party, against any of the following persons,
> that is to say . . . Christopher Henton, John Whitcombe, Jeffrey
> Butler, [and] Nicholas Brown . . . unless it be demonstrated that
> there are good reasons for taking such evidence notwithstanding
> the existence of a transcript record of the evidence given by those
> individuals in these proceedings.

(App. Ex. W, July 30, 2003 Order, ¶ 15.)

100.    The issues to be decided by the Commercial Court in London, England pursuant

to Sphere Drake's Applications are the same as the issues to be decided by the District Court of

Massachusetts pursuant to Hancock's Amended Petition to Compel Arbitration. (*See* John

Hancock Life Insurance Company's Verified Amended Petition to Compel Arbitration

Proceedings; Bell Aff. ¶ 63 and Ex. F.)

101.    The parties to the action commenced by Sphere Drake in London, England to

determine the seat of the arbitration over the Seven Agreements are the same as the parties to the

action commenced by Hancock in the District Court of Massachusetts to determine the seat of

the arbitration over the Seven Agreements. (*See* John Hancock Life Insurance Company's

Verified Amended Petition to Compel Arbitration Proceedings; Bell Aff. ¶ 63 and Ex. F.)

102.    Pursuant to the Arbitration Act 1996, where the parties to an arbitration

agreement have not designated the seat of the arbitration, the English Commercial Court has the

power to determine the seat of the arbitration having regard to the parties' agreement and all the

relevant circumstances.  (Supplemental Affidavit of Raymond Gordon Bell[10] ("Supp. Bell Aff.")
at ¶ 5, and Arbitration Act 1996 (attached thereto) at § 3.)

103.    The Arbitration Act 1996 provides that an English arbitral tribunal will be
required to act fairly and impartially as between the parties, giving each party a reasonable
opportunity of putting his case and dealing with that of his opponent, and to adopt procedures
suitable to the circumstances of the particular case, avoiding unnecessary delay or expense, so as
to provide a fair means for the resolution of the matters falling to be determined.  (Supp. Bell
Aff. at ¶ 7 and Arbitration Act 1996 (attached thereto) at § 33.)

104.    The Arbitration Act 1996 provides for several enumerated grounds for
challenging an arbitral award, which grounds are categorized as follows:  (1) challenges based on
lack of substantive jurisdiction by the tribunal; (2) challenges based on a serious irregularity
affecting the tribunal, the proceedings or the award; and (3) appeal based on a question of law.
(Supp. Bell Aff., ¶ 9 and Arbitration Act 1996 (attached thereto) at §§ 67-69.)

105.    In most arbitration clauses in reinsurance contracts that have been placed by
London brokers, the seat of arbitration is London and the applicable law is the law of England.
(Affidavit of James H. Hunt filed contemporaneously herewith ("Hunt Aff."), ¶ 11.)

106.    The London market is perceived as the center of reinsurance excellence where the
world's insurers come to place their reinsurances.  (*Id.*)

107.    The London market is perceived as the international center of arbitration for the
resolution of disputes throughout the world.  (*Id.*)

108.    London is often the chosen forum for reinsurance disputes and English law the
chosen law for reinsurance contracts involving parties domiciled in different countries.  (*Id.*)

---

[10] Filed with the Court on February 11, 2004 (as Docket No. 39) in conjunction with Sphere Drake's Memorandum
of Law in Opposition to John Hancock's Motion for a Temporary Restraining Order and Preliminary Injunction.

109.    Towards the end of the 1980s some of the London company market leaders recognized the sense in having a standard arbitration clause and rules for conducting arbitrations that were tailored specifically to the needs of the insurance and reinsurance industry. (*Id.*, ¶ 13.)

110.    In 1991 ARIAS (UK) ("A.I.D.A. Reinsurance and Insurance Arbitration Society (UK), being a UK-based Chapter of AIDA (Association Internationale de Droit des Assurances")) was formed by a group of underwriters and brokers together with solicitors and barristers specializing in insurance and reinsurance disputes. ARIAS (UK) set about drafting arbitration rules specifically geared to the needs of the insurance and reinsurance industry for world-wide use by the parties to any insurance or reinsurance dispute. The ARIAS Arbitration Rules were introduced in 1994 and revised in 1997 following the coming into force of the English Arbitration Act 1996. (*Id.*, ¶ 14 and Exhibit 2 thereto.)

111.    In the ARIAS Arbitration Clause the seat of arbitration and the proper law of the contract can be agreed by the parties at the time of negotiating the contract or at the contract wording drafting stage, but in default of a specific choice the seat of arbitration is always London. Unless the parties have chosen a particular law it is for the arbitrators to decide which law applies to the contractual obligations of the parties. (*Id.*, ¶ 16 and Exhibit 2 thereto.)

112.    The London Marine market's Joint Excess Loss Committee ("JELC") adopted a set of standard clauses in 1997 which together comprise the standard excess of loss reinsurance contract for use in that market. Clause 15 deals with Arbitration. The clause opens "15.1 The parties agree that prior to recourse to courts of law any dispute between them concerning the provisions of this contract shall first be the subject of arbitration." (*Id.*, ¶ 18 and Exhibit 3 thereto.)

113.   Unless otherwise agreed by the parties at the time of negotiating the contract or at the contract wording drafting stage and specified as such in the contract schedule, the JELC clause provides at ¶15.9 that the seat of arbitration shall be in London and the arbitrators shall apply English law as the proper law of the contract. (*Id.*, ¶ 19 and Exhibit 3 thereto.)

114.   Another example of a standard arbitration clause is the London Personal Accident excess of loss reinsurance market ("LMX PA market") which in 1992 adopted a standard contract wording known as "LMX P.A.1. – 1992" (also known as "LSW148A(1/92)." (*Id.*, ¶ 21.)

115.   A copy of the first page of LMX P.A.1. – 1992 is attached to the Hunt Affidavit as Exhibit 4, together with a copy of Article 21 of that wording.

116.   At Article 21 of that wording is the Arbitration Clause. It opens "This Article shall form a separate Agreement between the Reinsured hereon and the Reinsurers hereunder from the main Agreement . . . All matters in difference between the Reinsured and the Reinsurers . . . in relation to the main Agreement, including its formation and validity, and whether arising during or after the period of the main Agreement, shall be referred to an Arbitration Tribunal in the manner hereinafter set out." (*Id*, ¶ 23 and Exhibit 4 thereto.)

117.   In the penultimate paragraph of the LMX P.A.1. – 1992 wording, Article 21 provides that "[T]he seat of the Arbitration shall be in London and the Arbitration Tribunal shall apply the laws of England as the proper law of the main Agreement." (*Id.*, ¶ 24 and Exhibit 4 thereto.)

118.   The inclusion of a service of suit clause in a reinsurance agreement[11] that also includes an arbitration clause is a mechanism whereby each reinsurer agrees to submit to the

---

[11] It is Sphere Drake's position that references to "Service of Suit Clause" in the slips for the Seven Agreements and certain of the other John Hancock/Sphere Drake Ceded Contracts are irrelevant and immaterial to the issues before

18

jurisdiction of a U.S. court of competent jurisdiction in the event of their failure to pay an arbitration award.  (*Id.* ¶ 30.)

119.    The inclusion of a service of suit clause in a reinsurance agreement which includes an arbitration clause does not provide an alternative to arbitration or replace or revise any of the terms of the arbitration clause, nor does it provide an alternative to or vary the choice of law or seat of arbitration specified in the arbitration clause or as may be specified elsewhere within the reinsurance contract.  (*Id.,* ¶ 31.)

120.    Where a reinsurance contract or the arbitration clause within such a contract specifies that the contract is governed by the law of a particular country other than U.S. law, the mere inclusion of a service of suit clause does not amend the contract so that it is governed by U.S. law or any other law.  (*Id.,* ¶ 32.)

121.    Where a reinsurance contract is governed by English law as a default in the absence of the parties' specifying their choice of law, the mere inclusion of a service of suit clause does not amend the contract so that it is governed by U.S. law or any other law.  (*Id.*)

122.    Where an arbitration clause specifies that the seat of arbitration shall be in a particular city outside the U.S. or in a country other than the U.S., the mere inclusion of a service of suit clause does not amend the arbitration clause so that the seat of arbitration is moved to the U.S.  (*Id.,* ¶ 33.)

123.    Where an arbitration clause fails to specify the seat of the arbitration such that London, England is the default seat of the arbitration, the mere inclusion of a service of suit

---

the Court in this case.  However, to the extent the Court deems such references relevant and material, Sphere Drake has propounded the following facts regarding service of suit clauses in an effort to put Hancock's submissions in context and, in some cases, to illustrate factual disputes that should preclude the Court from entering summary judgment in Hancock's favor.

clause does not amend the arbitration clause so that the seat of arbitration is moved to the U.S. (*Id.*)

124.    A service of suit clause is not the equivalent of a choice of law clause.  (*Id.*, ¶ 34.)

125.    A service of suit clause is not the equivalent of a forum selection clause.  (*Id.*)

126.    The inclusion of a service of suit clause does not provide a U.S. cedent with the option of pursuing litigation over arbitration.  (*Id.*, ¶ 38.)

127.    The inclusion of a service of suit clause does not provide a U.S. cedent with the ability to change the seat of arbitration or change the law of the contract from that specified in the arbitration clause.  (*Id.*)

128.    Because the slips for the Seven Agreements do not contain choice of law or forum selection clauses, the seat of arbitration is London and the law governing the Seven Agreements is English law.  (*Id.*, ¶ 45.)

129.    There is nothing in the wording of the service of suit clause quoted by Hancock at pages 4-5 of the Memorandum in Support of John Hancock Life Insurance Company's Motion for Summary Judgment that prevents or bars the transfer of this case to a court outside the U.S. (*Id.*, ¶ 47.)

SPHERE DRAKE INSURANCE LIMITED

By its attorneys,

Andrea Peraner-Sweet  (BBO#550515)
Heather V. Baer (BBO#566746)
SALLY & FITCH
225 Franklin Street
Boston, MA 02110
(617) 542-5542

OF COUNSEL:
Harold C. Wheeler (Attorney I.D. No. 2996960)
Teresa Snider (Attorney I.D. No. 06210115)
Kevin J. O'Brien (Attorney I.D. No. 06193882)
Mark A. Schwartz (Attorney I.D. No. 6270580)
Butler, Rubin, Saltarelli & Boyd LLP
3 First National Plaza
70 West Madison Street, Suite 1800
Chicago, Illinois 60602
(312) 444-9660

<u>CERTIFICATE OF SERVICE</u>

I, Andrea Peraner-Sweet, hereby certify that a copy of this document was served upon all counsel of record by hand on May 26, 2004.

Andrea Peraner-Sweet

W:\S\Sphere\Hancock\Pleadings\Rule 56.1 Statementfinal.doc